483 P.2d 549

The STATE of Arizona, Appellee,

v.

Juan Manuel MOJARRO PADILLA, Appellant.

No. 2102.

Supreme Court of Arizona,
In Banc.

April 2, 1971.

Gary K. Nelson, Atty. Gen., by Andrew W. Bettwy and Carl Waag, Asst. Attys. Gen., Pheonix, for appellee.

R. Lamar Couser and Gilbert Gonzalez, Tucson, for appellant.

CAMERON, Justice.

This is an appeal from a jury verdict and judgment of guilty to murder in the 2nd degree. §§ 13–451, 13–452, and 13–453 A.R.S. The defendant was sentenced to a term of not less than twenty nor more than twenty-five years in the Arizona State Prison.

We are called upon to answer seven questions:

1. Whether the motion to suppress the evidence was improperly denied.

2. Whether the court erred in refusing to strike the prospective jury panel.

3. Whether the granting of a mistrial and excusing the jury placed defendant once in jeopardy and was the granting of mistrial error.

4. Whether the trial court erred in refusing to stay all proceedings upon the filing of a petition of habeas corpus.

5. Whether refusal to furnish defense counsel with an expert in Spanish was error.

6. Whether the trial court erred in denying a directed verdict of acquittal.

7. Whether it was error to refuse to give the defendant's requested instruction Number 25.

The facts necessary for a determination of the matter on appeal are as follows. Defendant, the victim, Juan Frausto Ramirez, together with Carlos Torres and Ignacio "Nacho" Valasquez, had several drinks while passing an evening at the El Dorado in Tucson. At approximately 1:00 a. m. on 17 March 1969, they ate together in the restaurant portion of the El Dorado and prepared to leave. While the testimony hereafter is controverted, it would appear that, at some disputed location, de-

fendant and the victim argued over gas money. In response to verbal abuse by Ramirez, defendant struck the victim in the face knocking him to the ground. The defendant then re-entered his car with Carlos and "Nacho". Thereupon, Ramirez tossed a rock through the windshield of the automobile defendant was driving and took flight. The car followed the victim—with lights out—to a nearby desert area. Pursuit terminated when the victim was caught on foot near some railroad tracks. At this location he was repeatedly struck with a rock until dead. Conflicting accounts of culpability were given; defendant alleging Carlos had inflicted the mortal blows by stomping; Carlos alleging defendant was to blame.

Defendant was placed under arrest at his home on the afternoon of the 17th. His sister-in-law translated the "Miranda warnings" to him at police request (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 [1966]). A search, pursuant to a signed "consent to search" form, disclosed defendant's clothing. Blood spots thereon matched the victim's group and type as did the blood on the rock. Statements were obtained by the police and defendant was held on an open charge of murder.

On 13 August 1969 the cause originally came for trial in Superior Court. A jury was selected and sworn to try the cause. The court was recessed until 9:30 a. m., 14 August 1961. The Deputy County Attorney became seriously ill and the cause was continued on the 14th, 15th, and 18th of August. A 15 September date was tentatively set, by stipulation. On 20 August, with the Deputy County Attorney once again present, the court declared a mistrial for the reasons that one juror was irrevocably committed to a move to Phoenix on the second day of September and the "tenure" of several others would lapse prior to the anticipated completion date of the trial. No alternate juror had been seated. No further proceedings were had on the cause before the first jury.

The matter was tried before a new jury and a verdict rendered on 10 October 1969.

## WAS THE MOTION TO SUPPRESS PROPERLY DENIED?

Defendant, in his motion to suppress, requested that the court suppress both oral and written statements of the accused and all physical evidence seized in the search of defendant's premises. In support of this contention, he alleges his being a Mexican native with a limited knowledge of English, together with an inept translation of those rights by his youthful sister-in-law, resulted in a non-intelligent and therefore involuntary waiver of his rights. The same ground is asserted as reason for vitiating the signing of the "consent to search" form.

It is uncontroverted that his sister-in-law did, in fact, translate the Miranda warnings to the defendant, upon police request, immediately upon his being placed under arrest. The testimony of a Spanish-speaking officer is as follows:

"Q What happened after you heard this conversation?

"A I asked the Defendant if the detectives had read a little card off to him and he stated they had, and he also commented his sister-in-law had explained it to him, and I asked him if he understood what was read on the card and he stated yes, and I told him that this read that we could get an attorney for him, and he stated he didn't want an attorney, and I asked him if he still wanted to talk to us about it and he stated he didn't want an attor-comment, I don't recall exactly what it was but something to the effect that he had nothing to hide and would talk with us.

"Q Do you speak Spanish?

"A Yes.

"Q Was this conversation you had with him in Spanish?

"A Yes."

As to the signing of the "consent to search" form the officer testified:

"Q Will you explain to us what happened in this regard?

"A * * * I asked him if he wanted to sign them and he stated yes, then he asked me to explain the consent to search warrant, that he did not understand it completely, so I explained to him what the consent to search warrants were.

"Q How did you do this, in English or Spanish?

"A In Spanish. Then I read the consent to search warrants to him and explained in Spanish and asked him if he understood them and wanted to sign them and he said, yes.

"Q What did you explain about these forms to him?

"A I explained to him it was his constitutional right to refuse to sign the forms and to allow the police to search his house or any of his premises. That he did not have to sign them, and if he signed them and we found anything that would connect him with the incident, that it could be used against him in court."

A review of the record on appeal indicates ample evidence to support the finding by the trial court that "the defendant was adequately advised of his constitutional rights in both Spanish and English, and that all oral statements made by the Defendant on March 17, 1969, are voluntary statements beyond a reasonable doubt", and that the search form was freely, voluntarily, and understandingly signed. State v. Farmer, 97 Ariz. 348, 400 P.2d 580 (1965); State v. Tigue, 95 Ariz. 45, 386 P.2d 402 (1963); Cipres v. United States, 343 F.2d 95 (9th Cir. 1965); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed.2d 1461 (1938).

 Defendant further contends that failure to immediately take him before a magistrate as provided in § 13–1418 A.R.S. made anything he said prior to being so taken inadmissible. Defendant was arrested on the afternoon of the 17th of March and was arraigned on the 18th of March. This court has previously held:

"We do not want it understood from anything said in this decision that we approve of or condone the peace officer's failure to take defendant, without unnecessary delay, before the magistrate upon the day of his arrest. However, we hold such a delay does not *ipso facto* make the statements inadmissible. To justify an exclusion, coercion or involuntariness must first be shown." State v. Jordan, 83 Ariz. 248, 257, 320 P.2d 446, 451 (1958).

No such showing has been made by the defendant herein.

## STRIKING THE JURY PANEL

 Defendant alleges that the jury panel was unconstitutionally drawn because it was not truly representative of the community. The jury panel was drawn from a list of registered voters and were summoned by telephone calls, being placed between 2:00 and 4:00 p. m.

This court, in State v. McGee, 91 Ariz. 101, 370 P.2d 261 (1962), cert. denied 371 U.S. 844, 83 S.Ct. 75, 9 L.Ed.2d 79 (1962) and State v. Narten, 99 Ariz. 116, 407 P.2d 81 (1965), has held that there must be a showing of prejudice before a denial of a challenge to a jury will be considered error. Both these cases involved jury panels selected from a voter registration list. See also § 21–301, et seq. A.R.S.

Defendant has not shown any prejudice (or prejudicial systematic exclusion) to his position which would make the trial court's denial of his challenge to the jury panel reversible error.

## DID THE TRIAL, SUBSEQUENT TO THE MISTRIAL DECLARED, CONSTITUTE DOUBLE JEOPARDY?

Defendant urges the declaration of a mistrial, over defendant's objection,

amounted to placing defendant in jeopardy even though no further proceedings were had subsequent to the empaneling and swearing of the first jury.

The jury was selected and sworn on 13 August 1969, but before any evidence or an opening statement could be made the Deputy County Attorney was taken ill.

On 18 August 1969 it was agreed by the court and counsel to continue the trial until 15 September. Some of the jurors voiced an objection to the time for which the matter was continued and one of the jurors stated that she planned to move from Tucson on 2 September and take over management of a business in Phoenix. The court declared a mistrial and excused the jury stating:

"The Court, therefore, feels that due to the length of the continuance for a period of approximately one month, that there could be no assurance of the presence of these jurors for many reasons, and that it would cause the jurors a hardship. The Court further feels that for the Defendant and the State to both have a completely fair and impartial jury, that it is in the best interest of all parties to declare a mistrial at this time and empanel a new jury; therefore, the Court declares a mistrial and orders that a new jury will be empaneled on September 15th prior to the taking of any evidence in the matter. The declaring of a mistrial and discharging of the jury is being done over the objection of counsel for the Defendant."

█ It is well settled that once jeopardy attaches there must be a "legal reason" for discharging the jury before the jeopardy can be removed and a new trial had. Westover v. State, 66 Ariz. 145, 185 P.2d 315 (1947); State v. Puckett, 92 Ariz. 407, 377 P.2d 779 (1963). We must first determine if jeopardy attached. Our Court of Appeals has stated:

"Jeopardy does not attach until a jury is empaneled and sworn and *proceedings commence.*" State v. Stout, 5 Ariz.App. 271, 275, 425 P.2d 582, 586 (1967), review denied 16 May 1967. (Emphasis ours).

State v. Burruell, 98 Ariz. 37, 401 P.2d 733 (1965) noted that to proceed to the additional phase of an opening statement was such a sufficient commencement of the proceeding as to constitute jeopardy We find no difficulty, however, in holding that something more than empanelment and the swearing of a jury must be done to constitute jeopardy to the defendant. The United States Supreme Court has held that the double jeopardy clause of the Fifth Amendment to the United States Constitution is applicable to the States. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L. Ed.2d 656 (1969). They did not define what constituted jeopardy and we believe the States are still allowed a certain degree of discretion as to what amounts to jeopardy. We hold, as a matter of law, that jeopardy had not attached in this case.

Defendant contends, however, that there was no legal justification for dismissal of the jury and that it was error to grant the mistrial.

█ We agree with the defendant that the fact that some of the jurors' time would run out before the trial would be ended was not a legal reason for declaring a mistrial.

We have stated:

"We hold that if jurors have served * * * for a period of four months from the date they first report for duty, and *thereafter* a case in which a jury has been demanded is *called for trial,* the superior court must order the drawing of a new venire." Coca Cola Bottling Co. of Flagstaff v. Jones, 74 Ariz. 393, 396, 250 P.2d 586, 588 (1952). (Emphasis ours) See present statute § 21–336.01 A.R.S.

The fact that a person may not be called to sit in a trial that commences four months after the juror has been called does not prevent a juror from sitting in a case that commences within the four month period

but continues beyond that time. To hold otherwise would mean that there could never be a jury trial more than four months long.

■ But this does not mean the trial court erred in granting the mistrial. The trial court must take all factors into consideration in determining whether to grant a mistrial. In this case, considering the fact that there was to be almost a month's delay from the empaneling to the commencement of the proceedings, the fact that the jurors were becoming restless and we assume inattentive, the business move of one of the jurors, and the fact that jeopardy had not attached, we believe the trial court did not abuse its discretion in granting the mistrial:

> "In a court of law, where we are dealing with a multitude of human factors, perfection is unattainable and neither the defendant nor the State is entitled to a perfect trial. Insofar as possible, however, both the State and the defendant are entitled to a fair and impartial jury. When events occur that cast an irrevocable cloud over the jury's fairness and impartiality it is far better to grant the motion for mistrial and start over again. This action should not be taken lightly, but when the interest of justice so demands, it should nevertheless be done." State v. Reynolds, 11 Ariz.App. 532, 535, 466 P.2d 405, 408 (1970).

## DID THE TRIAL COURT ERR IN REFUSING TO STAY THE PROCEEDINGS?

■ Prior to the second trial defendant filed a petition for writ of habeas corpus alleging double or former jeopardy. The petition was heard and denied by the trial court on 10 September 1969. Defendant then filed a notice of appeal from the denial of the petition. Defendant contends that once the notice of appeal in the habeas corpus action had been filed the trial court lost jurisdiction to proceed further except in aid of the appeal. Atkinson v. Atkinson, 2 Ariz.App. 1, 405 P.2d 919 (1965). We disagree. First, a writ of habeas corpus is a civil action, State v. Meek, 9 Ariz.App. 149, 450 P.2d 115, 31 A.L.R.3rd 808 (1969), cert. denied 396 U.S. 847, 90 S. Ct. 73, 24 L.Ed.2d 98 (1969), and tests the jurisdiction of the court to try the case. Unless the court, in issuing the writ so orders, the court may proceed in the criminal action. Second, habeas corpus may not be used to test the question of double jeopardy. State v. Morales, 90 Ariz. 11, 363 P.2d 606 (1961).

## WAS IT ERROR TO REFUSE TO FURNISH AN EXPERT IN THE SPANISH LANGUAGE?

This court has had the question of the necessity for the appointment of experts before it on other occasions and has refused to hold an indigent is entitled to experts at State expense. State v. Crose, 88 Ariz. 389, 357 P.2d 136 (1960); State v. Bowen, 104 Ariz. 138, 449 P.2d 603 (1969); State v. Chambers, 104 Ariz. 247, 451 P.2d 27 (1969); State v. Thomas, 104 Ariz. 338, 452 P.2d 512 (1969); State v. Superior Court In and For County of Pima, 2 Ariz.App. 458, 409 P.2d 742 (1966); San Miguel v. McCarthy, 8 Ariz.App. 323, 446 P.2d 22 (1968); State v. Counterman, 8 Ariz.App. 526, 448 P.2d 96 (1968).

■ Defendant alleges this particular refusal, however, denied his right of confrontation by limiting their ability to cross-examine both the officers and the sister-in-law as to the adequacy of the translations given as they relate to knowledgeable waiver. The statement of counsel is as follows:

> "Inasmuch as the Defendant is indigent and has no funds, we counsel are Court appointed. I don't believe we have the obligation to use our private funds for this purpose. We request that the Court issue an order which would provide the defense with a competent expert in Spanish who can make an official translation of how, for instance, Christine Lopez and Officer Rios or Anaya may have interpreted various rights and legal points to the Defendant. Actually how this would happen is we would ask Christine Lopez,

'How did you translate the following to the Defendant?' and we would read from the rights card. We want an expert and we have one in mind who could then take down vertabim her Spanish translation and testify as to the adequacy of the translation."

The court stated that the defense could use the official court interpretor for this purpose and denied the request. There was no evidence of inadequate translation at the trial and we find no prejudice to the defendant in the failure of the court to appoint the expert. Additionally, relative to advising the client so that he might assist in his defense, the trial court noted both appointed counsel spoke fluent Spanish.

## WAS THERE ERROR IN DENYING THE MOTION FOR DIRECTED VERDICT OF ACQUITTAL?

■ Defendant next contends that it was error for the trial court to deny the motion for a directed verdict of acquittal as to murder in the 1st or 2nd degree (§§ 13-451-452 A.R.S.). Defendant contends that no basis existed for a finding of premeditation and deliberation due to the lack of hostile behavior prior to going to the car.

Defendant contends that the evidence did not show malice which would support a conviction of 2nd degree murder or wilful premeditation and deliberation in addition so as to support a conviction for 1st degree murder. See State v. Singleton, 66 Ariz. 49, 182 P.2d 920 (1947).

"The malice which is an essential element to second degree murder means that condition of mind which prompts one to do a wrongful act intentionally, without legal justification or excuse." State v. Hudson, 85 Ariz. 77, 80, 331 P.2d 1092, 1094–1095 (1958).

And where as here there was sufficient time to premeditate and deliberate, the court was justified in giving instructions to the jury on both 1st and 2nd degree murder. State v. Intogna, 101 Ariz. 275, 419 P.2d 59 (1966). The facts, even taken most favorably in favor of the defendant, would not substantiate a ruling, as a matter of law, that there was no evidence of premeditation and deliberation when the defendant followed Ramirez for several blocks in his car with the lights out. The question was properly for the jury.

## WAS IT ERROR TO REFUSE TO GIVE DEFENDANT'S INSTRUCTION 25?

■ The trial court gave an instruction on 1st degree murder, 2nd degree murder, and voluntary manslaughter. Defendant contends that an instruction on involuntary manslaughter should have been given. The trial court is required when requested to give an instruction on any theory reasonably supported by the evidence. It is not error, however, to fail to instruct on a theory not reasonably supported by the evidence. This court has stated:

"An intentional use of a deadly weapon, however, is enough to infer an intent to cause serious bodily harm to the decedent. State v. Preis, 89 Ariz. 336, 362 P.2d 660. This inference, in addition to the fact that there is nothing in the record to indicate that the defendant shot other than intentionally substantiate the trial court's refusal to give an instruction in involuntary manslaughter." State v. Prewitt, 104 Ariz. 326, 332, 452 P.2d 500, 506 (1969). See also State v. Sorensen, 104 Ariz. 503, 455 P.2d 981 (1969).

Accordingly, we hold that the refusal to instruct on involuntary manslaughter was not error. Since there was evidence of a sudden quarrel or heat of passion, an instruction on voluntary manslaughter was warranted. Such an instruction was properly given in the trial court.

Judgment affirmed.

STRUCKMEYER, C. J., HAYS, V. C. J., and UDALL and LOCKWOOD, JJ., concur.