547 P.2d 531

**The STATE of Idaho, Plaintiff-Respondent,**

**v.**

**Alton W. WYMAN, Defendant-Appellant.**

**No. 11524.**

Supreme Court of Idaho.

March 2, 1976.

John L. King of King, Wiebe & Morris, Boise, for appellant.

Ellison M. Matthews of Matthews & Lee, Boise, Lloyd J. Webb of Webb, Pike, Burton & Pedersen, Twin Falls, amicus curiae.

Wayne L. Kidwell, Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Gordon S. Nielson, Senior Deputy Atty. Gen., Boise, for respondent.

DONALDSON, Justice.

On rehearing.

The previous opinion issued in this case on July 28, 1975, is withdrawn and this opinion is hereby substituted therefor.

This appeal is taken by Alton W. Wyman from the judgment of conviction for voluntary manslaughter entered against him for the death of June Diggs. The primary issues involved the adherence by the arresting police officers to the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), I.C. § 19–615, and Idaho Rules of Criminal Practice and Procedure, rule 5(a). For the reasons stated below, the judgment of conviction is affirmed.

After working approximately twelve hours, appellant Wyman left his place of employment at 10:30 p.m., December 1, 1972, and went to a trailer house occupied by himself and June Diggs, the deceased, in Garden City, Ada County, Idaho. The two then went to a bar and remained there drinking until 1:00 a.m. in the morning of Saturday, December 2. While leaving the bar, appellant and June Diggs began to argue. The argument continued while they drove to a cafe to buy cigarettes and then as they drove to the trailer house.

Upon their return to the trailer, the argument became more heated. Wyman testified that as he was trying to return a rifle to a closet, the deceased rushed across the room and grabbed the barrel of the rifle. The weapon discharged, fatally wounding June Diggs. Wyman immediately telephoned for the police and an ambulance.

The first officer arrived at approximately 2:00 a.m.[1] After observing the victim and initiating first aid, Officer Merrill of the Garden City Police Department asked appellant what had happened. Appellant replied that he had gone outside to retrieve the newly purchased cigarettes from the car, heard a shot, and returned to the trailer to find June Diggs mortally wounded.

By that time the ambulance crew and Officers Adair and Patterson had arrived, and the main activity was the treating of the victim. However, she was soon taken to a hospital and the appellant became the focal point of attention. Within a short time of the departure of the ambulance for the hospital, the officer that accompanied the victim telephoned the officers at the scene to inform them that June Diggs had died. Police testimony was given to the effect that Wyman was given an oral Miranda warning either immediately before or immediately after he was told of the victim's death.

From 2:00 a.m. to 3:00 a.m., Saturday, December 2, the police officers were occupied primarily with the collection of the physical evidence of the crime. Little direct questioning was done of the appellant, but he did repeat the initial version of his being outside when the victim was wounded.

At 3:00 a.m., appellant was taken to the Garden City Police Station. He was held without questioning until 5:00 a.m. Part of this time he was locked in a cell.

At 5:15 a.m., questioning of appellant was resumed. Wyman wrote and signed a statement repeating his original version of the shooting.[2] Prior to making the statement, appellant initialed and signed a notification of rights form.[3] The statement

---

1. All times hereinafter set forth are approximate.

2. "GARDEN CITY POLICE DEPARTMENT STATEMENT FORM
    Date 12-2-72
    Time 5:25 AM

"I, *Alton W. Wyman* Age *43* make the following statement of my own free will and without duress, promise of reward or promise of leniency in any manner whatsover, to *Ralph Snell* of the Garden City Police Department, Garden City, Idaho. Full well knowing that I have the absolute right to remain silent, that any statement I make will be used against me in court, that I have the right to the advice of a lawyer before making any statement, that I have the right to have a lawyer present to advise me at all times, that if I cannot afford one, the court will appoint a Public Defender to represent me if and when I go to court, and that if at any time I wish to refrain from making any statement I may do so and remain silent.

"*I left my place of employment at 9:45 to go home. I picked up my wife at home and went to the bar called My Room. We stayed their untill 1:00 then picked up a pack a ciggeretts at Chineese Lantern Cafe and went home. I started cooking supper. I went to the car to get the ciggeretts. I heard a shot. I went into the house and found her· on the floor, and called for help. Their was no arguments during the evening at any time.*

"I *Alton W. Wyman* have read the above statement of (*1*) pages, and I know the same to be a true and correct statement as given by me. I have initialed all mistakes noticed by me.
    "WITNESSED BY /s/ Ralph L. Snell
SIGNED *Alton W. Wyman*
    "*5:50 AM*" (Italic type denotes appellant's writing. The spelling is appellant's.)

3. "NOTIFICATION OF RIGHTS
    "Before we ask you any questions, you must understand that you have certain rights under both the Idaho and United States Constitutions. You do not have to talk with us. You have the absolute right to remain silent. Anything you say can and will be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. You have the right to request the services of the Public Defender at any time if you cannot afford to hire a lawyer. If you want a lawyer present or if you wish to consult a lawyer, you have the absolute right to remain silent until he is present or has been consulted, whether he be the Public Defender or counsel of your own choosing. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time and remain silent.

form also contained a recitation of the Miranda rights. This statement is hereinafter referred to as exhibit 30.

At 7:40 a.m., questioning was resumed and appellant wrote and signed a second statement. The story had changed to the extent that Wyman admitted holding the rifle in his hands when it discharged.[4]

---

"WAIVER

"(Place initials at the end of each statement below only after you completely understand what such statement means.)

"I have read the above statement of my rights and understand that:

"1. I have the absolute right to remain silent. *AWW*

"2. Anything I say can and will be used against me in Court. *AWW*

"3. I have the right to the advice of a lawyer before answering any questions. *AWW*

"4. I have the right to have a lawyer present during any questioning. *AWW*

"5. I have the right to a lawyer even if I cannot afford one, and if I cannot afford one, I may use the services of the Public Defender at anytime. *AWW*

"6. If I choose to answer any questions without the advice of a lawyer or without a lawyer being present, I have the right to stop answering questions at any time and remain silent. *AWW*

"I am willing to answer questions and make a statement. I do not want a lawyer, I understand and know what I am doing. No promises or threats have been made to me, and no pressure of any kind has been used against me.

"Witness /s/ Ralph L. Snell
 Witness _____

SIGNED *Alton W. Wyman*
Place Garden City P.D.
Date 12–2–72
Time 5:15 AM        "

(Italic type denotes appellant's writing.)

4. "GARDEN CITY POLICE DEPARTMENT STATEMENT FORM
Date 12–2–72
Time 7:40 AM

"I, *Alton W. Wyman* Age *43* make the following statement of my own free will and without duress, promise of reward or promise of leniency in any manner whatsoever, to *Bill Adair* of the Garden City Police Department, Garden City, Idaho. Full well knowing that I have the absolute right to remain silent, that any statement I make will be used against me in court, that I have the

---

This statement is hereinafter referred to as exhibit 7.

At 11:30 a.m., appellant was taken to an office used by Bud Mason to give polygraph tests. Appellant signed two constitutional rights forms, and a polygraph release form.[5] During appellant's stay, he was questioned with and without the

---

right to the advice of a lawyer before making any statement, that I have the right to have a lawyer present to advise me at all times, that if I cannot afford one, the court will appoint a Public Defender to represent me if and when I go to court, and that if at any time I wish to refrain from making any statement I may do so and remain silent.

"*Left my place of employment at 9:45. Went home. Picked up June and drove to the bar called My Room. We stayed their untill 1:00, then went to the Chineese Lantern and got a pack of ciggeretts. Then returned to the trailer house. We decided to eat at home. We had a small argument. She thru my cloths out of the trailer. At the time I went to the car to get a pack of cigeretts. I got back to the trailer and went inside. I sat on the davenport. The gun was leaning against the wall by the daveno. I picked it up to return it to the closet. She grabed it by the barrel and it went off. I laid her down and called for help.*

"I, _____, have read the above statement consisting of ( ) pages, and I know the same to be a true and correct statement as given by me. I have initialed all mistakes noticed by me.

"WITNESSED BY /s/ Ralph L. Snell
           Signed *Alton W. Wyman*"

(Italic type denoes appellant's writing. The spelling is appellant's.)

5. "DEPARTMENT OF LAW ENFORCEMENT LIQUOR LAW AND CRIMINAL INVESTIGATIONS
BOISE, IDAHO 83707

"Place Boise     Date Dec. 2, 1972

"I, Alton W. Wyman, do hereby request, voluntary, without duress, coercion, threats, promises of reward or immunity, to be examined with the use of the Polygraph (Lie Detector) instrument.

"I understand that operation of the instrument involves the use of electronic apparatus for the recording of emotional, physiological responses to questions asked by the Polygraph examiner.

"I have had the nature of this examination explained to me by A. R. Mason, and do hereby consent both to the placing of the necessary apparatus upon my person, and to

sensing devices of the polygraph attached to his body. The questioning done without the polygraph was by Mason and Officer Adair and was tape recorded. The cassettes upon which the recording was done are exhibits 31, 32, and 33.

At 4:30 p.m., the appellant was taken back to the Garden City Jail and placed in a cell.

At 7:30 p.m., Saturday, December 2, 1972, the appellant was arrested for first deree murder. Subsequently, he was transferred to the Ada County jail and was arraigned on Monday, December 4, 1972, on that charge.

Prior to trial appellant filed a motion to suppress exhibits 7, 30, 31, 32, and 33. This motion was denied. At trial by jury appellant was found to be guilty of voluntary manslaughter. Judgment was subsequently entered against him and he was sentenced to the custody of the State Board of Corrections for an indeterminate period of time, not to exceed (6) years.

It is from that judgment of conviction that this appeal is taken.

Appellant's first assignments of error contend that the trial court erred in denying the motion to suppress exhibits 7, 30, 31, 32, and 33. The primary contention is that the requirements of *Miranda, supra,* were not met by the investigating officer. According to the appellant, he was not given an oral Miranda warning at the scene of the shooting, or, in the alter-native, he was too overcome by grief, fatigue, and alcohol to intelligently and voluntarily waive his rights. Since, appellant continues, the original statements he made were wrongfully acquired by the police, the subsequent written statements (exhibits 7 and 30) and taped interrogation (exhibits 31, 32, and 33) are inadmissible under the so-called "poisonous fruit" doctrine of *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

■ When the investigating officers initially arrived on the scene, they did ask appellant about the shooting before reading him the Miranda warning. However, a review of the record indicates that those preliminary questions were proper under the rule that permits questioning of an individual if that individual has not become the focal point of an investigation. *State v. McClellan,* 96 Idaho 569, 532 P.2d 574 (1975); *State v. Sanchez,* 94 Idaho 125, 483 P.2d 173 (1971).

■ The appellant next contends that once the Miranda warning was given, he was unable to waive the rights intelligently and voluntarily because of the combined effects of fatigue, intoxication, and grief upon his thinking processes. Upon such claims, a defendant is entitled to a fair hearing to assess both the underlying factual issues and the voluntariness of his statement. *State v. Ortega,* 95 Idaho 239, 506 P.2d 466 (1973). The defendant was afforded such a hearing, and the court

---

the use of the recording devices operated contemporaneously with this examination.

"I do hereby release and forever hold harmless the State of Idaho and/or any Department thereof, their agents and/or employees, or their heirs or assigns, from any liability flowing from the operation of the devices or the use of the results thereof.

"I further agree that the results of the examination may be made available to the proper authorities.

/s/ A. R. Mason     *Alton W. Wyman*

WITNESSED     (Signature of person being examined)

            11:35 AM

            TIME

"This examination was concluded at ——— on the above date. I do completely reaffirm in its entirety my above agreement. In addition, I knowingly and intelligently continue to waive all my rights, including those listed above, and I willingly made all statements that I did make.

/s/ A. R. Mason     *Alton W. Wyman*

WITNESSED     (Signature of person examined)"

(Italic type denotes appellant's writing.)

found that appellant was given the appropriate warnings, the appellant was sufficiently alert to understand the meaning of the warnings, and that his statements to the police were voluntarily made.

■ Our examination of the record reveals that following the shooting the appellant was able to summon the authorities, initiate first aid, discuss the event with the police (although in a somewhat "rambling" manner), and attempt to return the weapon in a closet. Moreover, the record contains no evidence of coercion. In short, the findings of the lower court as to the *Miranda* requirements are supported by substantial competent evidence. Thus, the assignment is rejected. *State v. Ranstrom,* 94 Idaho 348, 487 P.2d 942 (1971); *State v. Thomas,* 94 Idaho 430, 489 P.2d 1310 (1971).

Furthermore, since *Miranda* was adhered to throughout the questioning, the appellant's challenge to exhibits 31, 32, and 33 under the *Harrison* doctrine is not tenable.

The appellant further argues that the statements and tapes are inadmissible due to violations of I.C. § 19–615 [6] and I.C.R. rule 5(a).[7] Following an arrest without a warrant, these provisions require that the accused be taken before a magistrate and arraigned "without unnecessary delay" and "a complaint be filed forthwith." The appellant contends that he was not promptly arraigned and that all statements obtained following that time are inadmissible. This claim is based on the exclusionary rule of *McNabb v. United States,* 318 U.S. 332, 638 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

■ A majority of states have rejected a per se application of the federal "McNabb-Mallory" rule which would render inadmissible a confession or statement obtained from an accused during an unlawful detention—unlawful because he was not brought before a magistrate "without unnecessary delay"—even though the statement was voluntarily given.[8] Instead, such delay is merely regarded as a factor, to be considered with other circumstances, in determining whether the statement was involuntary and therefore inadmissible under the due process clause of the Fourteenth Amendment.[9] We find this to be the more well-reasoned approach.

■ We do not want it understood from this opinion that this Court condones the failure of the police to comply with I.C. § 19–615 and I.C.R. rule 5(a). Such failure could result in an unconstitutional restraint on liberty, since the defendant is incarcerated without a determination of whether probable cause existed for the ar-

---

6. "I.C. § 19–615. *Procedure upon arrest without warrant.*—When an arrest is made without a warrant by a peace officer or private person the person arrested must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and an information, stating the charge against the person, must be laid before such magistrate."

7. "I.R.C., rule 5(a)— * * * If a person is arrested without a warrant, he shall be brought before a magistrate, and a complaint shall be filed forthwith. When a person appears initially before a magistrate, the magistrate shall comply with the applicable subdivisions of this rule."

8. *People v. Hosier,* 525 P.2d 1161 (Colo. 1974); *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972); *People v. Weav-*

*er,* 179 Colo. 331, 500 P.2d 980 (1972); *Luttrell v. Freeman,* 444 P.2d 857 (Okl.Cr. 1968); *State v. Perez,* 7 Ariz.App. 567, 442 P.2d 125 (1968); *People v. Combes,* 56 Cal. 2d 135, 14 Cal.Rptr. 4, 363 P.2d 4 (1961); *State v. Leland,* 190 Or. 598, 227 P.2d 785 (1951); *State v. Gardner,* 119 Utah 579, 230 P.2d 559 (1951); *State v. Fouquette,* 67 Nev. 505, 221 P.2d 404 (1950). *See also* Annot., 19 A.L.R.2d 1331 (1951).

9. *Commonwealth v. Eiland,* 450 Pa. 566, 301 A.2d 651 (1973); *State v. Mojarro Padilla,* 107 Ariz. 134, 483 P.2d 549 (1971); *State v. Plantz,* 180 S.E.2d 614 (W.Va.1971); *State v. Milford,* 186 N.W.2d 590 (Iowa 1971); *Reeves v. Commonwealth,* 462 S.W. 2d 926 (Ky.1971); *People v. Johnson,* 44 Ill.2d 463, 256 N.E.2d 343 (1970).

**492**

rest.[10] However, we hold that such a delay does not ipso facto make the statements inadmissible. The record indicates none of the "third degree" tactics that are the target of the "McNabb-Mallory" rule were used by the police. Certainly, no lengthy interrogations took place. Appellant was questioned for less than an hour from the time he was taken to the police station until the time of the polygraph test. Also during this interim the appellant was given, as he requested, time to lie down and rest. The polygraph test was administered by Bud Mason, who was not associated with the Garden City Police Force, but rather was a polygraphist for the state. The test did not take place at the police station but in Mason's office in the Derr Building. Only one officer was present at the time the statements were taken, and no police officers were present during the administration of the polygraph tests. While the entire examination lasted approximately four hours, it was not continuous in that breaks were allowed. It is this Court's opinion that appellant failed to show the coercion and involuntariness needed to justify the exclusion of the exhibits. We therefore find no reversible error.

The first of appellant's final two assignments of error as to the tapes, contends that prejudicial error resulted from the inclusion in the taped interrogations of the theories of the officers as to the method of the commission of the shooting.[11] The tapes contain the interrogating officers' statements to appellant that the trajectory of the fatal bullet indicated that the rifle barrel was parallel to the floor when the shot was fired. According to the officers, this would indicate that the appellant deliberately aimed the rifle at

the deceased. The appellant acknowledges that tape recordings may be properly admitted into evidence. The challenge is to the contents of the tape. The record indicates that the officers were extensively cross-examined at trial on the issue of the trajectory, thus the appellant's explanation as to how the shooting occurred was before the jury. Based upon the record at trial and the paucity of appellant's authority, we cannot say that appellant has met his burden of showing prejudicial error. *State v. Anstine,* 91 Idaho 169, 418 P.2d 210 (1966); *State v. Mundell,* 66 Idaho 297, 158 P.2d 818 (1945).

The burden is also not met in regard to appellant's claim of error as to a portion of the interrogation wherein appellant discloses a prior arrest for "drunken driving." This goes, according to appellant, beyond the scope of impeachment which allows the admission into evidence of prior felony convictions. The appellant objected to the material only after it had been played to the jury. Rather than declare a mistrial, the trial judge instructed the jury to disregard that material not relevant to the issue at hand. In view of the instruction and the relatively trivial nature of the admission in comparison with the charge of first degree murder with which appellant was being tried, the appellant has not met the burden discussed above.

Appellant next assigns as error the admission by the trial court of a photograph taken of appellant approximately one hour after the police first arrived. The photograph shows appellant standing in the kitchen area of the trailer house holding a cigarette and looking toward the camera. The clothes he was wearing had

---

10. The Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraints of liberty following an arrest. *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

11. In connection with these assignments, appellant notes that the tapes, containing the

police officers' theories, went to the jury room—allowing the jury to replay the prejudicial statements of the police officers without the guidance of a judicial officer. We find such an implication to be unfounded, as a search of the record indicates that a tape recorder, while offered into evidence, was never admitted as evidence.

patches of a dark substance on them. Testimony at trial indicated that the substance was June Diggs' blood.

The case of *State v. Oldham,* 92 Idaho 124, 438 P.2d 275 (1968), is offered for the proposition that posed photographs are not admissible when they merely portray a scene arranged to support a contention advanced by the profferer. *Oldham* involved a photograph of a cold chisel that was found in Oldham's car being fitted into an indentation on a juke box's coin box. The obvious intention was to show that the chisel would fit the mark on the box. The case at hand does not fall under the authority of *Oldham* because the challenged photograph was not a carefully arranged scene attempting to simulate a prior event, but rather simply a photograph of appellant wearing the same clothes he had been wearing at the time of the shooting. It was not an attempt at re-enacting the event, but simply showed appellant at the time the photograph was taken. If it was error it was harmless error because the appearance of appellant's clothing was of probative value to appellant's version of the shooting and his attempts at administering first aid to the victim. *See State v. Hokenson,* 96 Idaho 283, 527 P.2d 487 (1974); *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970).

Appellant also assigns as error the limitations imposed by the trial court upon evidence of the victim's psychiatric history. While the victim had been under the care of a Boise psychiatrist from 1959 until the time of·the shooting, the doctor was allowed to testify as to only two consultations. Those were in June and August of 1972.

An offer of proof was presented to the trial court by the defense to the point that the doctor in 1959 had diagnosed the victim as suffering from acute schizophrenia. As a result of the illness the victim had occasionally had auditorial hallucinations and bouts of irrational behavior. The appellant contends that the victim's entire psychiatric history is admissible because of the proffered self-defense theory. The case of *State v. Wilson,* 41 Idaho 616, 243 P. 359 (1925) is offered as authority by appellant for the rule that when the defendant in a criminal prosecution for homicide relies upon a theory of self-defense the reputation of the victim for being turbulent, quarrelsome, or dangerous is admissible.

The record indicates that several witnesses, including the psychiatrist, testified as to the victim's propensities toward violence. In view of the discretion afforded the trial court in evidentiary matters, it was not error for the trial court to exclude evidence that was primarily cumulative. *Avery v. State,* 514 P.2d 637 (Alaska 1973); *Maes v. People,* 169 Colo. 200, 454 P.2d 792 (1969).

The trial court did not err. The judgment of conviction is affirmed.

McFADDEN and SHEPARD, JJ., concur.

BAKES, Justice (dissenting).

The majority holds that the defendant appellant's second written statement and the tape recordings of his oral statements were properly admitted into evidence. It is my conclusion that the tape recorded oral statements were taken in violation of his rights under I.C. § 19–615, I.C.R. 5(a) and the Fourth Amendment to the Constitution of the United States. I also believe that these statements and the second written statement, to the extent they were self-incriminatory, were introduced into evidence in violation of the defendant's rights under the Fifth Amendment to the Constitution of the United States. For these reasons, I would reverse and remand for a new trial.

Because the defendant's arguments in connection with these rights can only be understood by reference to the circumstances of his arrest and detainment, a re-

view of the events of December 1 and 2, 1972, is necessary. The defendant left for work on Friday morning, December 1, 1972, and put in a twelve hour shift ending at approximately 10:30 p.m. After that, he and the deceased, June Diggs, returned to the trailer, where they stopped only long enough for the defendant to change his shoes. They then went to a Garden City bar where they stayed until the 1:00 a.m. closing time. While they were at the bar, the defendant had nothing to eat, but drank five bottles of beer and three or four shots of whiskey. He and June Diggs returned to the trailer, where the defendant began to prepare some food, but he was unable to cook the meal or eat because of an argument with June Diggs. Following the shooting, the defendant called the telephone operator, told her there was an emergency and asked her to send help. The police officers and the ambulance operators arrived shortly thereafter. According to the testimony of one of the officers, the defendant was "distraught" and "shook up," and the officer asked the defendant to lie down because he thought the defendant was going to faint. In spite of the commotion in the trailer, the defendant continued to lie down until he was requested to stand up by another officer.

At approximately 3:00 a. m. the defendant was taken to the Garden City police station. At approximately 5:00 a.m. the Garden City police began questioning him. During this interrogation, the defendant gave the statement set forth in footnote 2 of the majority opinion, 97 Idaho at 488, 547 P.2d at 533, in which he denied being in the trailer when June Diggs was shot. After the defendant had given the officers this statement, Thomas Sheffield, the officer in charge of the investigation, took the other officers who had been working on the case to breakfast. While they were away from the police station the defendant was locked in a cell, but according to the defendant's testimony he did not sleep during that time. When the officers returned from breakfast they brought the defendant a breakfast of steak or steak and eggs. Although the defendant was offered the food, he was apparently upset and, according to his testimony, "couldn't eat."

At this time, approximately 7:00 a.m., questioning resumed. Officer Sheffield told the defendant, in accusations laced with expletives, that he thought the defendant's statement concerning the shooting was a lie and that they wished to know more about the incident. The defendant testified that he asked to see a lawyer at this time, but the police officers testified that he did not make this request. (In his tape recorded statements made later in the day, the defendant was asked if he wanted to see a lawyer, but answered that he did not.) Some time later the defendant made his second written statement, the one set forth at footnote 4 of the majority opinion, 97 Idaho at 489, 547 P.2d at 534. Shortly thereafter, the defendant was returned to a cell. He remained there until approximately 11:30 a.m., when he was taken to be given polygraph tests.

The defendant was questioned intermittently by the polygraph operator or by a Garden City police officer for the next four to five hours. During this time tape recordings were made of two different question and answer sessions. These recordings, which included both the statements of the defendant and the questions and arguments of the police officers and polygraph operator, were admitted into evidence as exhibits 31, 32 and 33. At approximately 4:30 p.m., the defendant was returned to the Garden City jail and placed in a cell. At 7:30 p.m. on Saturday evening, December 2, 1972, he was formally arrested for first degree murder. He was not taken before a magistrate until Monday, December 4, 1972, even though there was a magistrate available in Ada County twenty four hours a day.

In the meantime, the efforts of the defendant's wife and of the defendant's employer to find out what had happened to him were rebuffed. Lavina Wyman, the

defendant's wife, testified at the preliminary hearing that she had called the Garden City police station at 10:00 a.m., 4:00 p.m. and 5:00 p.m. on Saturday, December 2, and that she had been told that the defendant had not been charged with any crime and would probably be released between 5:00 and 7:00 that evening. Jack Landers, the defendant's employer, testified at the preliminary hearing that he had called the police station to ask if he could speak with the defendant, but was told that he could not. He had also asked if it was possible to post bond for him and was told that the defendant would probably be on the street that afternoon.

Although the defendant was not formally placed under arrest until the evening of December 2, from approximately 3:00 a.m. that morning he was always physically restrained by a Garden City police officer or the polygraph operator, during which time he was being questioned or confined to a cell. His liberty was certainly restricted during this time, even though he had not been formally placed under arrest. Indeed, at the preliminary hearing, Garden City police officer Ralph Snell testified that when the defendant was in custody at the Garden City police station after 5:00 a. m. he was not free to leave.

Thus, when the defendant was questioned at 7:00 a.m. on the morning of December 2, and gave the written statement set forth in footnote 4, *ante,* he had not slept for twenty or twenty-one hours, he had not eaten during this period, he had drunk five beers and three or four shots of whiskey, and he had suffered through a highly emotional experience that earlier in the morning had caused him to be so distraught and upset that police officers had asked him to lie down because they feared he would faint. When he was questioned by the polygraph operator between 11:30 a.m. and 4:30 p.m. on that day, during which time the tape recordings admitted into evidence were made, he had gone without sleep for between twenty-six and thirty-one hours, and still had not eaten

during that time. Although his liberty had been restrained since approximately 3:00 a.m. that morning when he was taken to the Garden City police station, his wife and his employer had been told that he would probably be free later in the afternoon, and his employer had been told that it would be unnecessary to post bond for him. And finally, the defendant was not taken before a magistrate until Monday, December 4, 1972, over two days after he was taken into custody.

*The lengthy custodial questioning before bringing the defendant before a magistrate.* The continued questioning of the defendant which led to the two tape recordings which were admitted into evidence was done in violation of the defendant's rights under I.C. § 19–615 and I.C.R. 5 and of the Fourth Amendment to the Constitution of the United States. I.C. § 19–615 provides the following:

"19–615. *Procedure upon arrest without warrant.*—When an arrest is made *without a warrant* by a peace officer or private person the person arrested must, *without unnecessary delay*, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and an information, stating the charge against the person, must be laid before such magistrate." (Emphasis added).

I.C.R. 5 provides the following:

"I.C.R. 5. *Initial appearance before the magistrate.*—(a) IN GENERAL. . . . If a person is arrested *without a warrant,* he shall be brought before a magistrate, and a complaint shall be filed *forthwith.* When a person appears initially before a magistrate, the magistrate shall comply with the applicable subdivisions of this rule.

.    .    .    .    .    .

"(d) INITIAL DETERMINATION OF PROBABLE CAUSE. If the defendant was arrested *without a warrant,* the magistrate shall, after the complaint is laid before him, determine whether

there is probable cause to believe that an offense has been committed and that the defendant has committed it. . . ." (Emphasis added).

The defendant was not taken forthwith before a magistrate after he was taken into custody at 3:00 a.m. Instead, he was alternately questioned or confined in a cell for the following sixteen hours, at which time he was then formally arrested. He was not presented before a magistrate then, either, but waited approximately another 40 hours before he was brought before a magistrate. Thus, I think it is clear that although the defendant had not been formally arrested before 7:00 p.m., December 2, he had been under arrest since 3:00 a.m. that morning, and under the terms of the statute and the rule he was entitled to be brought before a magistrate, whose duty under I.C.R. 5(d) would have been to determine whether there was probable cause to believe that the defendant had committed a crime, and to advise the defendant of his rights and provide him with counsel to advise him concerning those rights.

Furthermore, the defendant had a right under the Fourth Amendment to the Constitution of the United States to be brought before a judicial officer to determine whether there was probable cause to believe that he had committed an offense. This right was explained in the recent case of *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In that case, the Court began by discussing the standard for arrest.

"The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). . . . This standard, like those for searches and seizures, represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime.

" ' . . . Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. . . .' *Brinegar v. United States,* [338 U.S. 160] at 176, 69 S.Ct. 1302, 1311 [93 L. Ed. 1879 (1949)].

"To implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy, the Court has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible. The classic statement of this principle appears in *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L. Ed. 436 (1948):

" ' . . . [The Fourth Amendment's] protection consists in requiring that [the usual inferences which reasonable men draw from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' " 420 U.S. at 111, 95 S.Ct. at 862.

The Court recognized that police officers will often be confronted with ambiguous situations and that the Constitution permits them to arrest persons in such situations, i. e., that "room must be allowed for some mistakes on their part." But, once the defendant is arrested, whether the officer has made a mistake or not, the Fourth Amendment requires that the defendant be taken before a magistrate. Furthermore, our rule and statute require that it be done and a complaint filed "forthwith" and "without unnecessary delay."

"[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate.

There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. . . . When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty. *Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint on liberty following arrest.*" 420 U.S. at 113, 95 S.Ct. at 863 (emphasis added).

Thus, while the police officers were certainly justified in taking the defendant into custody, the defendant's prolonged detention without being brought before a magistrate was a violation of his rights under I.C.R. 5, I.C. § 19–615, and the Fourth Amendment to the Constitution of the United States. The majority opinion recognizes this violation and scolds the police for failure "to comply with I.C. § 19–615 and I.C.R. rule 5(a)."

The question then which we must decide is: what is the appropriate remedy? The Supreme Court of the United States did not answer this question in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54. The majority in this case proposes the following as the answer to this question:

"A majority of states have rejected a per se application of the federal 'McNabb-Mallory' rule which would render inadmissible a confession or statement obtained from an accused during an unlawful detention—unlawful because he was not brought before a magistrate 'without unnecessary delay'—even though the statement was voluntarily given. Instead, such delay is merely re-garded as a factor, to be considered with other circumstances, in determining whether the statement was involuntary and therefore inadmissible under the due process clause of the Fourteenth Amendment. We find this to be the more well-reasoned approach." 97 Idaho at 491, 547 P.2d at 536 (footnotes omitted).

By stating that "delay is . . . a factor, to be considered . . . in determining whether the statement was involuntary," the majority has confused the interests sought to be protected by the requirement of I.C.R. 5 and of the Fourth Amendment to the Constitution of the United States that an arrestee must be presented before a magistrate forthwith or without unnecessary delay. The purpose of I.C.R. 5 and of the Fourth Amendment is to prevent an arrestee from being held in an extended illegal confinement by determining whether there is probable cause to believe that the arrestee has committed an offense. The arrestee's constitutional right under the Fourth Amendment to a probable cause hearing following a warrantless arrest cannot be protected if the admissibility of statements the arrestee has given during the illegal confinement which are a product of the illegal confinement is tested solely against the Fifth Amendment's test of voluntariness. The United States Supreme Court, which we are required to follow, has chosen not to evaluate violations of Fourth Amendment rights purely on the basis of voluntariness. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). By analyzing the admissibility of statements taken during an unlawful detention solely in terms of the arrestee's Fifth Amendment interests, the majority has failed to consider the critical questions before us.

In footnote 8 to its opinion, the majority cites eight cases and an annotation to bolster its contention that a confession obtained from an accused during an unlawful detention is not necessarily inadmissible, but the delay is merely a factor to be considered in determining voluntariness and

admissibility. All of the cases predate *Gerstein v. Pugh*. Four of these cases and the annotation predate the landmark *Miranda* decision, and all but one of these four also predate *Mallory*, so I do not believe that those older cases are of any precedential value. Neither do I believe that all of the more recent cases the majority has cited in that footnote stand for the majority's proposition. *State v. Perez*, 7 Ariz.App. 567, 442 P.2d 125 (1968), did not involve a statement given during an unlawful detention; it involved a statement given at the time of arrest and a claim that a subsequent alleged unlawful detention would make that statement inadmissible. *Luttrell v. Freeman*, 444 P.2d 857 (Okl.Cr.1968), was a *habeas corpus* proceeding, not a criminal trial, and the admissibility of a confession taken during an alleged unlawful detention was not discussed in that opinion. In *People v. Hosier*, 525 P.2d 1161 (1974), the Supreme Court of Colorado held that the admission of a confession given by an arrestee who had not been taken before a magistrate without unnecessary delay was not grounds for reversal unless the arrestee could show he had been "denied some basic constitutional right by reason of the failure to comply with the rule." 525 P.2d at 1164. *Hosier* predated *Gerstein v. Pugh*, which clearly states that prolonged deprivation of liberty without presentation before a magistrate for a probable cause determination is a violation of an arrestee's Fourth Amendment rights. Thus, the rationale for the *Hosier* decision has been undermined by *Gerstein v. Pugh* because *Hosier* was implicitly based in part upon a holding that prolonged detention without a probable cause determination by a magistrate is not a denial of a basic constitutional right. In *People v. Weaver*, 179 Colo. 331, 500 P.2d 980 (1972), the Supreme Court of Colorado held that a statement taken during an unnecessary delay was not inadmissible "if the record also shows, as it does here, that there was no studied attempt to avoid taking the defendant before a county

judge." 500 P.2d at 982. While I do not believe such a rule can survive in light of the decision of the Supreme Court of the United States in *Gerstein v. Pugh*, even if this were the proper rule to be applied, it cannot be said upon this record that there was no studied attempt to avoid taking the defendant before a magistrate, because those who sought to contact the defendant that morning to obtain his release were apparently rebuffed, and the defendant was not taken before a magistrate until Monday morning, December 4, over two days after his arrest. Therefore, *Weaver* is inapposite to this case. Furthermore, both *Hosier* and *Weaver* were also based upon the premise that compliance with the requirements of *Miranda* would render an ensuing admission or confession admissible, i.e., that the *Miranda* warnings given to protect a defendant's Fifth Amendment rights would also protect his Fourth Amendment rights against unlawful arrest or unlawful restraint of his liberty. That was the basis upon which the majority of this Court wrote its original opinion in this case which it withdrew after rehearing, apparently recognizing that the rationale of the *Hosier* and *Weaver* cases was incorrect in view of the recent decision of *Brown v. Illinois, supra*. In *Brown* the Supreme Court of the United States held that the *Miranda* warnings were not a cure-all which made statements taken following an illegal arrest admissible into evidence. In *Brown*, the Supreme Court of the United States characterized the lower court holding in the following manner:

"The court, in other words, appears to have held that the *Miranda* warnings in and of themselves broke the causal chain so that any subsequent statement, even one induced by the continuing effects of unconstitutional custody, was admissible so long as, in the traditional sense, it was voluntary and not coerced in violation of the Fifth and Fourteenth Amendments." 422 U.S. at 597, 95 S.Ct. at 2258.

The Court then went on to hold that a confession or statement obtained by the exploitation of an illegal arrest is not admissible merely because it follows a *Miranda* warning and a waiver of *Miranda* rights.

"[T]he *Miranda* warnings, *alone* and *per se*, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited. . . .

"While we therefore reject the *per se* rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative *per se* or 'but for' rule. . . . The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct are all relevant. . . . The voluntariness of the statement is a threshold requirement. . . . And the burden of showing admissibility rests, of course, on the prosecution." 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (footnotes omitted).

I believe the same rule should be applicable during an extended confinement following an arrest without a warrant whenever the arrestee has not been brought before a magistrate without unnecessary delay and would adopt the holding of *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972), a case cited by the majority in its footnote 8 for the proposition that unreasonable delay is a factor to be considered in the admissibility of a statement or a confession, but which said the following:

"We have held that failure to comply with [the rule providing that one arrested without a warrant must be taken without unnecessary delay before a judicial officer] does not ipso facto render inadmissible evidence obtained by the police during the 'unnecessary delay' and that it is incumbent upon defendant to show some prejudice from the delay. . . . While this Court has never articulated precisely what constitutes 'prejudice' in the context of 'unnecessary delay' proscribed by [the rule], we think it appropriate to follow the federal approach and exclude all evidence obtained during 'unnecessary delay' except that which . . . · has no reasonable relationship to the delay whatsoever." 290 A.2d at 419.

While the written statement which the officers took at approximately 7:30 a.m. on Saturday could arguably not be characterized as the result of unnecessary delay, those tape recorded statements which were made between 11:30 a.m. and 4:30 p.m. in the afternoon were certainly made in violation of the defendant's Fourth Amendment rights and his rights under the Idaho statute and rule to be taken before a magistrate without unreasonable delay and should have been held to be inadmissible for a violation of both the Fourth Amendment and the Idaho statute and rule.

*The voluntariness of the confessions.* The majority concludes that the defendant's statements were admissible by the following reasoning:

"The record indicates none of the 'third degree' tactics that are the target of the 'McNabb-Mallory' rule were used by the police. Certainly no lengthy interrogations took place. Appellant was questioned for less than an hour from the time he was taken to the police station until the time of the polygraph test. Also during this interim the appellant was given, as he requested, time to lie down and rest. The polygraph test was administered by Bud Mason, who was not associated with the Garden City Police Force, but rather was a polygraphist for the state. The test did not take place at the police station but in Mason's

office in the Derr Building. Only one officer was present at the time the statements were taken, and no police officers were present during the administration of the polygraph tests. While the entire examination lasted approximately four hours, it was not continuous in that breaks were allowed. It is this Court's opinion that appellant failed to show the coercion and involuntariness needed to justify the exclusion of the exhibits." 97 Idaho at 492, 547 P.2d at 537.

I cannot agree that no lengthy interrogations took place. The defendant was regularly interrogated from 5:00 a.m. Saturday morning to 4:30 p.m. Saturday afternoon. He had not eaten or slept for nearly twenty hours before questioning began, and did not eat or sleep during the next twelve hours over which he was interrogated. The record indicates that he was bereaved at the loss of June Diggs, an intimate friend for five years. He had consumed five beers and three or four shots of whiskey on an empty stomach prior to the shooting. The appellant was in no condition to make a knowing and intelligent waiver of his rights and could easily be intimidated in such a situation. Assuming for the sake of argument that his statements had not been taken in derogation of his rights to be brought before a magistrate without unnecessary delay, nevertheless I think it is clear as a matter of law that the defendant did not give his statements after a knowing and intelligent waiver of his rights. I believe the case of *Commonwealth v. Eiland,* 450 Pa. 566, 301 A.2d 651 (1973), which the majority has cited in footnote 9 of its opinion, points to the result which we should reach in this case.

> "[T]his Court has emphasized that when '[t]he questions in the voluntariness area have passed beyond the physical coercion stage to the much more difficult area of psychological coercion . . . a close analysis of all the surrounding circumstances is necessary,' *Commonwealth ex rel. Butler v. Rundle,* [429 Pa. 141, 239 A.2d 426 (1968)], and that 'the test for any involuntary confession, must concern itself with those elements impinging upon a defendant's will.' *Commonwealth v. Baity,* 428 Pa. 306, 315 n. 7, 237 A.2d 172, 177 n. 7 (1968). Thus in the instant case we must weigh all the factors influencing appellant's will at the time he made his statement. The record evinces *uncontradicted* evidence that appellant, a 20-year-old with a tenth grade education, was isolated for several periods of time; that upon his initial interrogation he refused to admit involvement in the shooting; that eleven hours later when told by the police he would get more lenient treatment if he confessed, he signed an incriminating statement; and that he was not arraigned until some twenty-five hours after arrest.
>
> "The combination of all these factors based on the Commonwealth's uncontradicted evidence constituted a subtle but nonetheless powerful form of impermissible psychological coercion. . . . We conclude that appellant's signed statement was involuntary and should therefore have been suppressed." 301 A.2d at 654–655.

The reasoning of the Pennsylvania Court is applicable in this case. At the time of his arrest the defendant was bereaved and possibly in a state of intoxication; he was questioned and refused to admit any connection with the shooting; he was then told that his first story was a lie and that the truth was wanted; he was then intermittently questioned over a ten hour period during which time he had gone without food or sleep for up to thirty hours. The defendant was not a habitual arrestee familiar with the techniques of questioning and knowledgeable of his rights. Given all these factors, the circumstances were inherently coercing, and his waiver was not knowing and intelligent. Accordingly, I would hold that his written statements

and the tape recorded oral statements were inadmissible.

For all of these reasons I would remand for a new trial.

McQUADE, C. J., concurs.