661 P.2d 311

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Michael D. CALEGAR,
Defendant-Appellant.**

No. 13158.

Supreme Court of Idaho.

March 30, 1983.

Michael E. Donnelly, Boise, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Stanley R. Voyles, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

Appellant appeals from a conviction for armed robbery. On April 7, 1978, in the early evening, an armed robbery occurred at a grocery store in Boise. Mr. Don Swenson, an assistant manager, was at the safe at the front of the store. A multicolored shopping bag was dropped at his feet, and he was ordered to fill it with money. He laughed, thinking it was a joke, but the robber said, "Don't laugh, I've got a gun." The robber, wearing sunglasses, gloves, a hat, and a blue windbreaker with white lining, then opened his windbreaker to reveal what Mr. Swenson described as a brown-handled black gun tucked into his pants. Swenson gave him approximately $2,500, mostly in ones and fives, with some twenties. The robber then left.

At the same time, a Mr. Heatherington was loading recyclable material onto his flatbed truck in back of the Albertson's store. He saw a man run around the store, carrying something, hop into a Volkswagen bug, and drive away very fast. Mr. Heatherington thought these actions were suspicious, so he recorded the license plate number on the car. The officers traced a nearly identical license number to Michael Calegar, who lived in Nampa, and obtained a warrant for his arrest. On April 8, 1978, officers set up a stakeout at his residence. Calegar and a friend arrived at the residence. Calegar entered the home, and then emerged carrying a small green suitcase. As the officers made their presence known, Calegar jumped into the vehicle with the suitcase, but he and his friend were placed under arrest and removed from the vehicle. At the time of the arrest, a police officer also removed the suitcase from the car after being informed by the defendant that it belonged to him. At that time defendant was advised of his *Miranda* rights. Also at that time, the defendant told officers not to open the case without a search warrant.

Defendant was interviewed on tape by a detective. He was again reminded of his *Miranda* rights and signed a consent form. After officers questioned defendant for some time, he asked for his attorney. He was then allowed to contact his attorney, who apparently told him to remain silent. The detective continued talking to defendant,[1] although the defendant said nothing incriminating during that time. After several minutes, the detective asked defendant if he would open the suitcase, which he apparently did. The case contained approximately $1,100.00, all in ones and fives.

On April 11, 1978, Swenson, the store manager, was shown a photographic lineup containing defendant's picture. He chose defendant's photo, indicating that was the man who robbed him.

Defendant filed a motion to suppress nearly all of the evidence in this case, including the oral statement made to the detective, and the contents of the suitcase. In a memorandum decision, the trial judge denied the motion to suppress those items. He ruled that the oral statement given to officers was freely and voluntarily given, and that search of the suitcase was pursu-

---

1. The bulk of this conversation does not amount to interrogation. It consisted only of an attempt by the officer to clarify the defendant's wishes, and an explanation by the officer of the consequences of defendant's decision. Only seven minutes, including pauses in the conversation, elapsed between defendant's call to his attorney and the opening of the suitcase.

ant to defendant's consent, freely and voluntarily given. Defendant then stood trial and, after presenting no evidence on his own behalf, was convicted of armed robbery.

Defendant then filed this appeal. He asserts that the trial court erred in allowing admission of the oral tape recording, in not suppressing evidence taken from the suitcase, and in not giving instructions requested by defendant concerning the reliability of eyewitness testimony.

■ We will first consider the alleged error in not giving defendant's requested instructions. Defendant's proposed instructions dealt with the unreliability, in general, of eyewitness testimony. These instructions were requested to support the defendant's attempt to persuade the jury not to accept the eyewitness testimony presented in the case. The requested instructions would have been tantamount to a comment on the evidence, which is impermissible under our practice. The credibility of the store manager's eyewitness testimony was adequately covered under the court's other instructions.

In another context we have recently decided a case where a trial judge refused to allow expert testimony on the same subject, reliability of eyewitness testimony. *State v. Hoisington,* 104 Idaho 153, 657 P.2d 17 (1983). In ruling that it was within the judge's discretion to disallow such testimony, we quoted the following from a Rhode Island case:

"We are persuaded that the subject matter of the proffered testimony in this case, the trustworthiness in general of eye witness observations, was not beyond the ken of the jurors, and therefore the trial justice did not abuse his discretion in excluding this evidence. Through cross examination, defense counsel was able to probe into the witness's capacity and opportunity for observation, her attention,

interest and distraction. The jury was perfectly capable of assessing the witness's credibility by weighing the inconsistencies and deficiencies elicited in cross examination." *State v. Porraro,* 404 A.2d 465, 471 (R.I.1979).

■ The principle expressed in the above quotation applies to the appellant's requested instructions on the subject of reliability of eyewitness testimony. We ruled in *State v. Radabaugh,* 93 Idaho 727, 471 P.2d 582 (1970), that a trial court did not err in refusing an instruction directing the jury to the weakness of particular evidence. A trial judge should similarly refuse an instruction on a subject which is more properly dealt with through the observations of the jurors themselves, of both witnesses in the courtroom and through their everyday experiences. The unreliability of eyewitness testimony can be amply and adequately demonstrated to the jury through cross examination of the eyewitnesses themselves and through argument to the jury.[2]

We next consider the alleged error in allowing the contents of the suitcase to be presented in evidence. Defendant alleges that coercive statements made by the detective immediately prior to the opening of the suitcase precludes a finding that defendant voluntarily consented to the search. The defendant argues that since the detective did not have a search warrant, and no other exception to the warrant requirement has been shown, the contents of the suitcase should not have been admitted at trial.

■ Under the facts of the present case, we must reject the defendant's arguments and uphold the search of the suitcase. While the trial court based its denial of the motion to suppress on the appellant's consent, there is another exception to the warrant requirement present here. Police are allowed to search all areas within an arrestee's immediate control, and such a search will be upheld as "incident to a valid ar-

---

2. In addition, we were unable to find copies of the defendant's proposed instructions in the record. It is well settled that an appellate court cannot review claimed error in not giving instructions where the instructions themselves do not appear in the record. *See Abercrombie v. Stoddard,* 39 Idaho 146, 228 P. 232 (1924); *Barton v. Woodward,* 32 Idaho 375, 182 P. 916 (1919).

rest." *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Warrantless searches conducted incident to a lawful arrest have long been recognized by the United States Supreme Court as reasonable under the fourth amendment. Such searches were approved, in *dicta,* in cases such as *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); and *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). Since that time the court has struggled to determine how extensive such a search should be. Clearly, the person of the arrestee can be searched "to discover and seize the fruits or evidences of crime." *Weeks v. United States, supra* 232 U.S. at 392, 34 S.Ct. at 344. The allowable perimeter of such a search gradually expanded to include the area within the arrestee's control. *Carroll v. United States, supra* 267 U.S. at 158, 45 S.Ct. at 287. The right to search the place where the arrest was made was expressly recognized in *Agnello.*

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted." *Agnello v. United States,* 269 U.S. at 30, 46 S.Ct. at 5.

The common reasons cited by way of justification for allowing such a search are (1) police officers when making a valid arrest need to secure their own safety by searching out and removing any weapons on the person of the arrestee, or within an area under his control, and (2) there is a need to search for and seize evidence that is located on the person of the arrestee or within his immediate control to prevent the destruction of that evidence. *See Chimel v. California, supra.*

Since recognition of the "incident to a lawful arrest" exception to the warrant requirement, the United States Supreme Court has been wrestling with the question of how far such a search can extend. Before *Chimel,* some cases upheld searches of the room where a suspect is arrested. *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *United States v. Rabinowitz,* 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Other pre-*Chimel* cases invalidated searches of the room or house where a suspect is arrested, especially where officers discovered the evidence in a closed container, such as a desk drawer. *Go-Bart Importing Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); *United States v. Lefkowitz,* 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); *Trupiano v. United States,* 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948).

The court, in *Chimel v. California, supra,* was thus faced with numerous conflicting cases, with no clearcut definition of the scope such a search could take. The search in *Chimel* was a detailed search of the entire house where an arrest was made. The court attempted to more clearly define the scope of such a search by ruling that the search of the entire house was unreasonable and thus illegal, noting:

"Application of sound Fourth Amendment principles to the facts of this case produces a clear result. The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area. The scope of the search was, therefore 'unreasonable' under the Fourth and Fourteenth Amendments and the petitioner's conviction cannot stand." 395 U.S. at 770, 89 S.Ct. at 2043.

Still, even after *Chimel,* the lower courts have had difficulty in defining the area within an arrestee's control for purposes of applying this exception. No clearcut rule

emerged that could apply to a search such as the one we are concerned with here until *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In *Belton* the court was confronted with "the question of the proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupants." *Id.* 101 S.Ct. at 2863. The search challenged in *Belton* was that of the pocket of a jacket belonging to an occupant of the vehicle, where the occupants were all under arrest and positioned outside, away from the vehicle, and the jacket was located inside the passenger compartment of the vehicle. The *Belton* court noted that the "courts have found no workable definition of 'the area within the immediate control of the arrestee' when that area arguably includes the interior of an automobile and the arrestee is its recent occupant." *Id.* 101 S.Ct. at 2864.

The court then concluded that articles inside the passenger compartment of a vehicle "are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary item.'" 101 S.Ct. at 2864. The court held that a police officer can validly search, as a contemporaneous incident to arrest, the passenger compartment of an automobile. The court then went on to note that:

> "[P]olice may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach. *United States v. Robinson, supra* [414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1974)]; *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3

L.Ed.2d 327. Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." 101 S.Ct. at 2864. The court concluded that a "container" should be defined as "any object capable of holding another object," including "closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment as well as *luggage,* boxes, bags, clothing, and the like." 101 S.Ct. at 2864, n. 4 (emphasis added).

It is clear that the search in the present case falls squarely within the scope of a valid search, as defined in *Belton.*[3] The suitcase was recovered from the inside of the automobile that Calegar was in when he was arrested pursuant to a valid warrant. Thus, it was fully within constitutional limitations to conduct a search of the suitcase at that time. Since the police would have been justified in conducting the search at the time that defendant was arrested in the car, the justification was still present when the search was conducted at the station.[4] As noted by the United States Supreme Court in *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974):

> "It is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention. If need be, *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), settled this question. There the defendant was arrested at his

---

**3.** Another line of United States Supreme Court cases allows a search where the search is justified because the police have probable cause to believe contraband is contained in an automobile. Our holding makes it unnecessary to discuss that line of cases. *See United States v. Ross,* —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

**4.** Another exception applicable in the present case is the inventory search exception. When suspects are arrested, police officers normally take them and their belongings to the police

station. At the station, most employ a routine procedure that involves inventorying and cataloging the various personal items taken from the suspect. An inventory search of this type is said to be a "reasonable" search, and thus falls outside the scope of the fourth amendment. Under the facts of the present case, such an inventory search could have been conducted. *See South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 3093, 49 L.Ed.2d 1000 (1976).

hotel, but the belongings taken with him to the place of detention were searched there. In sustaining the search, the Court noted that a valid search of the property could have been made at the place of arrest and perceived little difference

> 'when the accused decides to take the property with him, for the search of it to occur instead at the first place of detention when the accused arrives there, ....'" 94 S.Ct. at 1237.

*See also Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975).

■ We also agree with the considered opinion of the trial court, which held that the defendant voluntarily consented to the search of the suitcase. We agree with the statement of the trial court that, "Except for the fact that the defendant was in custody there is nothing to indicate that the act of the defendant in opening the case was anything but a voluntary, uncoerced act."

Finally, defendant alleges error in the failure of the trial court to suppress the tape recorded interrogation. He claims that, under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *State v. Monroe,* 103 Idaho 129, 645 P.2d 363 (1982), there should have been no interrogation of the defendant at all after he invoked his right to counsel; thus, any statement made to officers after invocation of the right to counsel is inadmissible.[5] He also claims the coercive nature of the conversation tainted any statements he made, making them involuntary.

■ Defendant argues strenuously that he was prejudiced by the admission of these statements. However, it is clear in listening to the tape recorded portion of the interrogation occurring after invocation of the right to counsel, that the defendant did not make any incriminating statements at all. Indeed, he emphatically stated that he was not guilty. The only thing that happened in the final minutes of the conversation was the act of defendant opening the suitcase, which we have already ruled constituted a valid search. Clearly, the admission of defendant's statement on the part of the tape after he invoked his right to counsel, if it was error, could only constitute harmless error, because nothing that the defendant said in those final minutes was in any way incriminating. *See State v. LePage,* 102 Idaho 387, 630 P.2d 674 (1981).

The defendant's conviction is affirmed.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, Justice, dissenting.

In light of the U.S. Supreme Court's decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and this court's decision in *State v. Monroe,* 103 Idaho 129, 645 P.2d 363 (1982), I must dissent.

*Edwards* held:

> "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." 451 U.S. at 484, 101 S.Ct. at 1884, 68 L.Ed.2d at 386.

---

**5.** It is unnecessary for us to reach the question of whether *Edwards* and *Monroe* would invalidate a confession or admission, under the facts of this case, if the defendant had made an incriminating statement. However, we do note that the United States Supreme Court has recently limited the scope of *Edwards* in a *per curiam* opinion released November 29, 1982. *See Wyrick v. Fields,* —— U.S. ——, 103 S.Ct.

394, 74 L.Ed.2d 214 (1982). In that case the Eighth Circuit had interpreted *Edwards* to be a "*per se*" rule. The United States Supreme Court reversed the Eighth Circuit decision, stating that a "*per se*" rule "certainly finds no support in *Edwards,* which emphasizes that the totality of circumstances, including the fact that the suspect initiated the questioning, is controlling."

This court adopted *Edwards* and the reasoning contained therein in *State v. Monroe, supra.* Today the court departs from that reasoning in its conclusion that Mr. Calegar is arguing for the non-admission of non-statements. One wonders why the prosecutor would argue to admit those statements if they were not effective. We cannot, at the appellate level, intelligently evaluate what effect the admission of those statements may have had on the jury in the drama of the actual courtroom setting. Although Mr. Calegar did not make a dramatic statement of guilt, the inferences to be drawn from that testimony may well have influenced the jury. The rules announced in *Edwards* and *Monroe* are clear. Once the defendant has invoked his right to counsel, any further interrogation must cease; and if further interrogation does take place at the police officers' instigation, those statements *must* be suppressed. In failing to follow this clearcut rule, the majority is encouraging that behavior which the exclusionary rules seek to discourage. In circumstances such as this the police may very well gamble by continuing the questioning in anticipation that at least three members of this court will find it to be "harmless error."

This court, in fulfilling its responsibilities to supervise the administration of justice, has a duty to encourage adherence to, not evasion of, the procedural safeguards which promote fair trials and due process.

Additionally, the question of consent goes to the admissibility of the suitcase and its contents. The trial court admitted the suitcase over defendant's objection, finding that the consent was voluntarily and intelligently given. Based on *Monroe* and *Edwards* it is clear that this was not a valid waiver. The majority ignores the consent issue and bases its holding on another exception to the warrant requirement. A review of the record reflects that consent was the only issue raised below to support admitting the evidence. It is a rule of appellate review that issues not raised below will not be passed upon by this court on appeal.

The majority is correct that this area of criminal law is fraught with confusion. The majority is likewise correct in setting forth two justifications for allowing searches incident to an arrest, those being (1) to secure the safety of the police officers making the arrest, and (2) to prevent the destruction of evidence. However, neither of these justifications is present in this case. The suitcase was seized by the arresting officers, thereby precluding any possibility that the defendant might obtain a weapon from it or destroy the evidence it contained. The cases cited by the majority, including *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), all involved a search conducted at the scene of the arrest, i.e., "incident to the arrest". In the instant case, the search of the suitcase was conducted several hours later, purportedly with the defendant's consent. *Belton* concerned the ambiguity of what area is within the immediate control of the arrestee. The court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a *contemporaneous* incident of that arrest, search the passenger compartment of that automobile." 453 U.S. 460, 101 S.Ct. 2864, 69 L.Ed.2d 775 (emphasis supplied). The court then reasoned that since the passenger compartment is within the reach of the arrestee, so also will the containers be within his reach. The holding of *Belton* is in keeping with the purpose behind this exception to the warrant requirement. In footnote 3, 101 S.Ct. 2864, the court stated:

> "Our holding today does no more than determine the meaning of *Chimel's* principles in this particular and problematic content. It in no way alters the fundamental principles established in the *Chimel* case regarding the basic scope of searches incident to lawful custodial arrests."

As stated above, the search in the instant case cannot be justified by either of those purposes. Additionally, for emphasis sake, the search here was not contemporaneous with the arrest; therefore it could not be "incident to the lawful arrest." The majority seems to recognize this argument when

it includes the language of *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974):

"It is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention. If need be, *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), settled this question. There the defendant was arrested at his hotel, but the belongings taken with him to the place of detention were searched there. In sustaining the search, the Court noted that a valid search of the property could have been made at the place of arrest and perceived little difference

'when the accused decides to take the property with him, for the search of it to occur instead at the first place of detention when the accused arrives there . . . .' " 415 U.S. 803, 94 S.Ct. 1237, 39 L.Ed.2d 775.

*Edwards* involved a search of defendant's clothing ten hours after his arrest. There was no substitute clothing available that late at night and as soon as substitute clothing was available it was provided. Additionally, the court noted that this was the standard practice in that city. The court stated, "[t]his was no more than taking from respondent the effects in his immediate possession that constituted evidence of crime." It can logically be contended that because Edwards still had his clothing the evidence it contained could still be destroyed. In the instant case the suitcase was within the control of the police, there was no possibility that the evidence it contained would be destroyed, and it would have been of little inconvenience for the authorities to procure the required search warrant. The reasoning of the dissent in Edwards is a more correct statement of the law.

"As the Court has repeatedly emphasized in the past, 'the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." ' *Coolidge v. New Hampshire,* 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564; *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576. Since it is conceded here that the seizure of Edwards' clothing was not made pursuant to a warrant, the question becomes whether the Government has met its burden of showing that the circumstances of this seizure brought it within one of the 'jealously and carefully drawn' exceptions to the warrant requirement.

The Court finds a warrant unnecessary in this case because of the custodial arrest of the respondent. It is, of course, well settled that the Fourth Amendment permits a warrantless search or seizure incident to a constitutionally valid custodial arrest. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427; *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. *But the mere fact of an arrest does not allow the police to engage in warrantless searches of unlimited geographic or temporal scope.* Rather, the search must be spatially limited to the person of the arrestee and the area within his reach, *Chimel v. California, supra,* and must, as to time, be *'substantially contemporaneous with the arrest,'* Stoner v. California, 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856; *Preston v. United States,* 376 U.S. 364, 367–368, 84 S.Ct. 881, 883–884, 11 L.Ed.2d 777."

The dissent then concluded that there was no justification for dispensing with the warrant requirement, the police had ample time to seek a warrant, and exigent circumstances were not present to excuse their failure to do so.

The search involved here was removed in time from the arrest, the suitcase was secured, and the police had ample time to procure a search warrant. Their failure to do so made the search "unreasonable" under the fourth amendment to the United States Constitution, applicable to the states through the fourteenth amendment.

In footnotes, the majority states that its disposition of the case makes it unnecessary to discuss the automobile exception, and the probable cause exception to the warrant requirement. These exceptions, as well as the incident to a lawful arrest exception, were not argued or briefed either below or to this court. Any decision or discussion should be based on a full factual development, which is not present here. Consequently, no comment is made in this dissent.

Finally, in a footnote, the majority states that this search would have been justified under an inventory search. While this may be true, no such inventory search was conducted and it is not the role of this court to create facts to support a conclusion.

I would reverse the holding of the district court and remand in light of *Edwards v. Arizona, supra* and *State v. Monroe, supra.*

BISTLINE, J., concurs.

BISTLINE, Justice, dissenting.

*State v. Monroe,* 103 Idaho 129, 645 P.2d 363 (1983), was not an inadvertent illustration of erudition on the part of this Court, but the only course of action open after the Supreme Court of the United States vacated this Court's earlier opinion, 101 Idaho 251, 611 P.2d 1036 (1980), and remanded for further consideration in light of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Justice Huntley's opinion accurately declares the proper applicability of *Edwards* to this case, and pungently notes that "[t]his Court, in fulfilling its responsibilities to supervise the administration of justice, has a duty to encourage adherence to, not evasion of, the procedural safeguards which promote fair trials and due process." Those remarks well express the same thoughts which I entertained when the Court in its 1980 opinion affirmed Monroe's conviction, while all the while not deigning to dispose of views set forth in the dissenting opinion.

It is significant to point out in this *Calegar* case that at the time of the suppression hearing, which was in October of 1978, *Edwards* had not been decided. It was handed down between *Monroe I,* May 15, 1980, and *Monroe II,* May 12, 1982. There is no doubt in my mind but that Judge Walters would have reached a contrary result had he had the benefit of *Edwards,* but he did not. Nor is it likely that he had the benefit of *People v. Grant,* 45 N.Y.2d 366, 408 N.Y. S.2d 429, 380 N.E.2d 257 (N.Y.Ct.App.1978), which, though decided in the summer of 1978, appears to not have been published until late 1978 or early 1979. *Grant* was heavily relied upon by the dissenting opinion in *Monroe I,* 101 Idaho at 261, 611 P.2d at 1046. In that dissenting opinion, mention was also made of the failure of the officers to take the *Monroe* defendant before a magistrate, as the law of Idaho requires, especially after the right to counsel had been claimed, 101 Idaho at 260, 611 P.2d at 1405, and of the fact that, if a magistrate was not immediately available, Monroe should have been in a cell awaiting the magistrate's pleasure, and not baited by police pressures which led to his confession. *Id.* In a similar vein and at greater length in *Monroe II,* relying on the views of Justice Bakes as expressed in *State v. Wyman,* 97 Idaho 486, 497, 547 P.2d 531, 542 (1976), I pointed out that "suppression of the confession was also mandated by violations of statutory procedures for ... immediate arraignment before a magistrate." 103 Idaho at 133, 645 P.2d at 367. Footnote 5 of that opinion pointed to the exemplary views of Judge James Towles of the First District:

> " 'As to the delay in arraignment, it is the Court's opinion that there was no reasonable excuse nor was the delay itself reasonable. If the police officer had probable cause to arrest the defendant, he also had sufficient probable cause to present the facts to a Magistrate for the issuance of a warrant of arrest and to permit the Magistrate to fix bond, if appropriate. Therefore, the excuse that the officers were too busy or were gathering additional evidence and therefore could not take the defendant before the Magistrate, is not credible. If further evidence needed to be secured, the arrest should not have been accomplished.

" 'This lends *credence to the defendant's argument that the delay was for the purpose of obtaining a statement more than for any other reason, and cannot be condoned by the Court as a clear violation of the duty of a police officer to present an accused before a neutral and detached Magistrate "forthwith".* The day in question was a Monday and the Court was open and available.' *State v. LaMere,* Crim. No. 12613 (1979)."

*State v. Monroe,* 103 Idaho at 133 n. 5, 645 P.2d at 367 n. 5 (emphasis added). It must also be remembered that with Calegar, the arrests made were by ununiformed police who did not have any warrant in hand. Accepting that a warrant had issued, and accepting also that the police officers had sufficient reason to believe that Calegar had committed a crime and were informed that a warrant had issued, I.C. § 19–603(3); *State v. Crawford,* 99 Idaho 87, 577 P.2d 1135 (1978), the absence of a warrant at hand was all the more reason to comply with the law requiring an arrested person to be taken forthwith before a magistrate. The complaint upon which the warrant had been issued was signed before Judge Carey on the 8th day of April, 1978 (although inexplicably not filed the same date), and it is reasonable to assume that police officers who can find a magistrate when they want a warrant issued should be able to find a magistrate before whom they are required to immediately take an arrested person—"forthwith." Anything less than complete compliance with the law is not acceptable. The police officers who enforce the law should be informed as to what the law requires of them in the performance of their duties. Justice Bakes in his *Wyman* opinion clearly perceived this philosophy.

Today, however, writing for a majority of the Court, he finds many reasons and ways in which Calegar's statutory and constitutional rights have not been violated.

In a reasoning which I do not profess an ability to comprehend it is said that *Edwards* itself somehow justifies the police in detaining Calegar at the station and in persisting in their efforts to get him to talk notwithstanding that he unequivocally informed them that he would not do so, wanted counsel, and directed that they not open his suitcase. It is pointed out ever so nicely that the warrantless search of his suitcase was justified under the consent theory, under the inventory theory, under the contraband theory, and under the concealed weapon theory. All of which leads me to suggest a closer examination of the testimony of—not Calegar, who did not testify—the police officers.

It borders on the asinine to even suggest that Calegar's suitcase was a source of danger to the police officers. John F. Carroll, an officer of the Boise City Police testified as to Calegar's arrest in Canyon County. While a cartoonist could more ably portray the scene, Carroll's testimony vividly portrays him pointing a shotgun at Calegar from around the corner of a house, and saying, "Police, Calegar, freeze." Calegar, who was approaching a vehicle dove into it on the passenger side. A Manuel Sanchez was at the wheel, and with him was his small daughter. Another ununiformed officer named Botcher was with Carroll. On the officer's commands, all three persons "exited" the vehicle and on command became prone on the ground, and, other than the small child, were immediately handcuffed—weapons being kept pointed at or near their heads. The suitcase, meanwhile, was in the vehicle. Not one officer ever testified to considering the suitcase as a threat, and their testimony indicates capable officers who would not render themselves so ridiculous as to assert such an absurdity. Calegar was taken to the Canyon County jail in a Canyon County marked vehicle, and the others, Sanchez and daughter, were driven there by Carroll.

Instead of taking Calegar to a magistrate, he was kept around and given further warnings and asked further questions, until some 45 minutes later when Detective Wood arrived from Boise "and took command of the situation," by which apparently was meant more skilled interrogation including a tape recorder.

All this time, since the arrest, the suitcase was not a threat, but it was a curiosity. Officer Carroll removed it from the vehicle which Calegar had "exited," and at the jailhouse turned it over to the jailer, who, said Carroll, wanted to inventory it—which he thought required him (the jailer) to open it. The prosecutor's question and Carroll's answer leave little doubt as to what Calegar thought about it all:

"Q. Who is present now?

"A. Myself, the jailer, Detective Botcher, Mr. Calegar, and some other deputies that I'm not aware of who they were.

"Q. Now, at this time did Mr. Calegar make any statements when the jailer brought up the question of inventory of the case you had possessed and you had placed in his proximity?

"A. Yes.

"Q. Okay, what did Mr. Calegar say about that case at that time?

"A. He then said that we would have to get a search warrant to search it, that he absolutely did not want us to open it.

"Q. Now, did he make any specific statement as to an inventory of that particular case?

"A. Only that he didn't—just, you know, emphatic that he didn't want us to open it.

"Q. What did you do in response to that?

"A. I told him that I would re-take custody of it, seal the case, turn it over to Detective Wood when he came over, and it along with Mr. Calegar would be transported to Boise where it would be booked into our property locker.

"Q. So I take it, if we can back up here for a moment, you advised the defendant of his rights pursuant to the *Miranda* card, once at the scene of his arrest and once also in the Canyon County Jail?

"A. Yes, sir.

"Q. Now, when did the discussion take place or not the discussion, but the booking procedure take place in relation to the time when the question came up about the case itself, was it before or after that happened?

"A. It happened before he was booked in when we discussed the case downstairs."

Tr., (Motion to Suppress) pp. 74–75.

That same cross-examination also leaves little doubt that, intentionally or not, impermissible questioning took place after Calegar had by then twice insisted on his right to not be interrogated.

"Q. Now, you've indicated I believe two if not three times that you did not attempt to question the defendant or do anything along those lines. Would you indicate why not?

"A. Because I told him of the facts that I had in regards to the case, that there was a warrant out for his arrest, that he had been identified from a photo lineup, and as far as I was concerned we had the right subject. I had no questions to ask of him.

"Q. Was any particular person to be assigned the actual investigation of this case from the Boise Police Department?

"A. Yes, sir.

"Q. Who was that?

"A. Detective Wood.

"Q. Okay. That was not yourself, and this case was not assigned to you for investigation?

"A. No, sir.

"Q. Now, you do and are aware of a question or I think we can call it an interrogation process that did take place involving this defendant?

"A. Yes, sir.

"Q. And that took place by means of Detective Wood questioning, and you were present, and it was tape recorded?

"A. Yes, sir.

"Q. Do you recall prior to that if any other person was questioned or interrogated prior to Mr. Calegar making a statement?

"A. Yes, sir.

"Q. Who was that?

"A. Mr. Sanchez.

"Q. Were you also present or aware of the tape recording or the interrogation of Mr. Sanchez?

"A.   Yes, sir.

"Q.   Who conducted that questioning or interrogation?

"A.   Detective Wood."

Tr. (Motion to Suppress), pp. 74–75.
The scenario at the time of Detective Wood's appearance and his taking command was a Calegar insisting on his rights, or what he knew of them, and a suitcase sealed with tape and marked as police evidence.  Enter Wood:

"MR. DONNELLY:  We would call Officer Wood back to the stand again.

DIRECT EXAMINATION CONTINUED "BY MR. DONNELLY:

"Q.   Would you restate your name please?

"A.   Stan Wood.

"Q.   And, Officer Wood, you're the same officer who previously testified this morning in this hearing, is that correct?

"A.   That's correct, yes.

"Q.   You remember that you're still under oath at this time?

"A.   Yes, I do.

"Q.   I had questioned you earlier this morning, Officer Wood, regarding your involvement in the preliminary investigation of the armed robbery as it related to the preparation of a photographic lineup, and there are two other areas that I would like to address now at this point in time.

"First of all, in addition to the preparation of the photographic lineup, did you have additional functions or duties with respect to the investigation of this offense?

"A.   Yes.

"Q.   Okay.  Such as the examination of any particular suspects?

"A.   Yes.

"Q.   Okay.  With respect to that function, did you have the occasion to come into contact with Michael Calegar?

"A.   Yes, I did.

"Q.   When would that have been?

"A.   That would have been April 8th.

"Q.   And approximately what time of the day would it have been?

"A.   About 6:00 o'clock in the evening I believe.

"Q.   And where was that at?

"A.   Canyon County Jail.

"Q.   And had you gone from your office in Boise to the Canyon County Jail for the purpose of questioning or interrogating Mr. Calegar?

"A.   Yes, that's partially correct.

"Q.   Was there an additional function or purpose?

"A.   Yes, to gather any evidence that was there; to continue the investigation at that point.

"Q.   How did you know that Mr. Calegar had been arrested?

"A.   I was notified by our dispatch.

"Q.   Upon proceeding to the Canyon County Jail, where did you discover or find Mr. Calegar?

"A.   He was upstairs when I first saw him in the booking area of the Canyon County Jail.

"Q.   And who was present at that time?

"A.   Officer Carroll, and I believe his name is Jim Vail, the jailer on duty at that time.  Also, Alex Sanchez.

"Q.   Were there any other officers present that you observed?

"A.   There may have been some other jail personnel in the area.  I wouldn't recall their names.

"Q.   As you entered the room, can you describe for me what was occurring, what was transpiring?

"A.   I believe Mr. Calegar was sitting in the booking office.  I believe Mr. Vail was filling out some forms on him; and I met Officer Carroll in the hall just outside the booking office.

"Q.   All right.  And upon encountering Officer Carroll, did he turn over to you at that time any property?

"A.   Yes, he did.

"Q.   What did he turn over to you?

538

"A. It would have been a green Samsonite overnight case.

"Q. Did he advise you of the source, where he had obtained this case?

"A. Yes, he did.

"Q. Was that case sealed at that time in any fashion?

"A. Yes, it had police evidence stickers on it.

"Q. Do you know who had attached those?

"A. Officer Carroll had stated that he had.

"Q. But you did not observe him do that actually?

"A. No.

"Q. Okay. Did you then take custody of the suitcase?

"A. Yes, I did.

"Q. And what did you do with it at that point?

"A. Went downstairs with the suitcase and interviewed Alex Sanchez.

"Q. And where was Michael Calegar at that point?

"A. I believe he remained upstairs during that time.

"Q. Was he then with Officer Carroll?

"A. No, he remained in the custody of the Canyon County authorities.

"Q. Was Officer Carroll with you then when you questioned or interrogated Mr. Sanchez?

"A. Yes, he was.

"Q. And how long did that process take, approximately?

"A. Maybe 15 minutes.

"Q. Following the completion of that questioning, what did you do then?

"A. I then talked to Michael Calegar.

"Q. And did you have him brought down by the sheriff's office or by Officer Carroll?

"A. I believe it was Canyon County authorities that brought him down.

"Q. Where did the questioning or interrogation of Mr. Calegar take place?

"A. It was downstairs in the court house there in one of the investigators offices.

"Q. And during the questioning of Mr. Calegar who else was present?

"A. Officer Carroll.

"Q. Was there anyone else present?

"A. Not that I can recall.

"Q. Did you utilize a tape recorder at all in the taking of this statement from Mr. Calegar?

"A. Yes, I did.

"Q. Was that tape recorder recording at the time that Mr. Calegar entered the room?

"A. I don't believe so. I believe I turned it on after he entered.

"Q. Was Mr. Calegar in handcuffs at the time that you commenced the interrogation?

"A. No, he was not.

"Q. What were the conditions of the area like at that time, was it a lighted room?

"A. Yes, it was an office.

"Q. Okay. Were you seated at a desk?

"A. Yes.

"Q. Where was Mr. Calegar seated?

"A. Across from me at the same desk.

"Q. What did you advise Mr. Calegar at that time?

"A. I advised him of his *Miranda* rights."
Tr. (Motion to Suppress), pp. 103–107.

"MR. HOWEN: Detective Wood, I believe you have before you marked as state's exhibit number 3. Will you briefly identify what you have for the record?

"THE WITNESS: Yes. This is a tape recording that was taken of Alex Sanchez and Michael Calegar during the evening of April the 8th of this year. Also, my department number is written on it.

"MR. HOWEN: Your Honor, I believe we can set it up so we can begin right with the first conversation with Mr. Calegar.

"(Whereupon, a tape recording is played in open court at this time.)

"Q. (By Mr. Donnelly) Officer Wood, we just had played as you are aware the tape which you made of the conversations that you had with Mr. Calegar on the evening of April the 8th, 1978. Let me ask you, officer. How long a period of time was involved in the process of your examination or interrogation of Mr. Calegar?

"A. It was approximately 15 minutes after 6:00 when I advised him of his rights, and I believe the tape stated it was a few minutes after 7:00 or before 7:00 when it ended. So it would have been roughly 40 or 45 minutes.

"Q. The tape itself does not appear to be that extensive in terms of actual time being utilized. Were there conversations that you had with Mr. Calegar that were not recorded on that particular tape?

"A. The tape ran out after the first half of it. It ran out. I didn't realize it at that time. We probably talked for another 5 minutes, somewhere in that area. I'm not sure exactly how long. At that point he stated he was wanting to contact an attorney, and he made the call. At that point I realized the tape was off and I changed it back over.

"Q. All right, and the resumption of the tape on side 2 thereof appears to be the point at which Mr. Calegar has all ready made his phone call to counsel?

"A. That's correct.

"Q. And if I understand the indication on that tape apparently *he made a determination at that point to not discuss the matter with you further based on advice of counsel?*

"A. *That's right, yes.*

"Q. *Nevertheless, you continued to examine him with respect to matters that occurred relating to the robbery itself, is that not right?*

"A. *That's correct.*

"Q. Let me ask you, Officer Wood. Is the normal procedure for yourself to continue questioning despite the request of an individual in custody that that activity be ceased?

"A. Would you repeat that please?

"Q. *Is it your normal practice to continue interrogation or questioning of an individual in custody despite the fact that that person has indicated that he does not want to talk to you further at that point?*

"A. *Not once that he tells me he doesn't want to talk to me any further, no.*

"Q. *Is it your statement that Mr. Calegar did not indicate that to you?*

"A. He did not state that to me.

"Q. He did not state that explicitly to you in those words, is that what you mean?

"A. That is correct.

"Q. *Were you under the impression that he wanted to continue to talk to you at that point regarding the robbery?*

"A. *Not particularly wanted to. He hadn't expressed really one way or the other. He said that he thought that he was going to take the advice of his attorney.*

"Q. Which was communicated to you to be what?

"A. He didn't tell me what you had said. I advised him when he got ready to call you that you would probably advise him not to talk to me.

"Q. Well, the problem I'm having is that it appeared to me at least from reviewing the tape itself that the indication of Mr. Calegar was thoroughly clear and unequivocal, and that is that he did not on advice of counsel desire to proceed with the matter further at that point.

"MR. HOWEN: Judge, I'll object to that as being argumentative at this time.

"THE COURT: Sustained.

"Q. (By Mr. Donnelly) Well, let me ask perhaps differently, Officer Wood.

"*Was it your opinion* at that point in time once we get to what is now side 2 of that tape that is in evidence, *that Mr. Calegar was still willing to talk to you at that point?*

"A. *It was my opinion* that he had been told by you not to talk to me. However, *he was still willing to talk.*

"Q. Okay. *Did you discuss with Mr. Calegar* at any point in time *your need to obtain a search warrant to review the contents of the suitcase* which you had in your custody?

"A. *No, I did not.*

"Q. *Are you aware of Officer Carroll having discussed that at all with Mr. Calegar?*

"A. *I wasn't until today.*

"Q. Did you ever attempt to get a search warrant for a search of that particular valise or suitcase?

"A. No, I did not.

"Q. Did you open that suitcase yourself, Officer Wood?

"A. Mr. Calegar did.

"Q. Who else was present at that time when that occurred?

"A. No one at that time. Officer Carroll had left a little bit before that.

"Q. The opening of the suitcase occurred subsequent to Mr. Calegar's telephone call to counsel?

"A. That is correct, yes.

"Q. In the suitcase itself apparently were discovered certain items or various items, some of which is apparently money, is that correct?

"A. That is.

"Q. In response to discovery filed by the prosecutor here, there is an indication of a cash amount of money in the sum of $1,165.36. Is that the amount that was discovered in this case?

"A. I'm sorry, what was the amount?

"Q. $1,165.36.

"A. No, there's approximately $1,105.00 found in the suitcase.

"Q. Was there additional money that you obtained from Mr. Calegar or from his residence?

"A. The additional money was obtained through Jim Vail who was the jail authority over there at that time, the jailer, had been taken from the person during the start of the booking procedure.

"Q. But not in the suitcase apparently?

"A. No.

"Q. Did you break the seal on the suitcase itself?

"A. I don't remember whether I did or the defendant did.

"Q. Did you advise Mr. Calegar that he had a right not to consent to that search of that valise?

"A. No, I did not."

Tr. (Motion to Suppress), pp. 114–119.

In *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336 (1983), just short of two months ago, this Court, absent Justice Huntley, had before it a strikingly similar case. In that case, as in this, the majority experienced little trouble in affirming the introduction of the defendant's confession. In that case, too, I was unable to join the Court's opinion, and was obliged to recite at length the teachings of *Miranda,* and the further clarifications made in its progeny. Much of that which I wrote in *Mitchell* is applicable here—in particular with regard to interrogation which continues after the giving of the *Miranda* warnings. The opinions in Calegar's case should not be considered by the trial bench and bar without contemporaneously revisiting the salient excerpts from *Miranda* which are found in the dissenting opinion in *Mitchell.* The proposition before the Court today is serious enough, however, to merit repeating here the police stratagems to which the *Miranda* court gave recognition, and then condemned, and then proscribed:

"The *Miranda* Court also concerned itself with modern techniques of interrogation, and its discussion is directly applicable to the interrogation of Mrs. Mitchell, who was an accused defendant confronted by three police officers in the isolation of a motel room, a definite psychological advantage to the police officers, if we are to accept

" 'that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, "Since *Chambers v.*

*Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). Interrogation still takes place in privacy. *Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms.'* 384 U.S. [436] at 448, 86 S.Ct. [1602] at 1614 [16 L.Ed.2d 694] (emphasis added).

" 'The officers are told by the manuals that the "principal psychological factor contributing to a successful interrogation is *privacy*—being alone with the person under interrogation." The efficacy of this tactic has been explained as follows.

" ' "If at all practicable, *the interrogation should take place in the investigator's office or at least in a room of his own choice.* The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law." ' 384 U.S. at 449–50, 86 S.Ct. at 1615 (emphasis added) (footnote omitted). 'The *examiner is to concede him the right to remain silent.* "This usually has a very undermining effect. First of all, he is disappointed in his expectation of an unfavorable reaction on the part of the interrogator. Secondly, a *concession of this right* to remain silent *impresses the subject with the apparent fairness* of his interrogator." ' 384 U.S. at 453–54, 86 S.Ct. at 1617 (emphasis added) (footnote omitted).

" 'From these representative samples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear. In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must "patiently maneuver himself or his quarry into a position from which the desired objective may be attained." When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. *The police then persuade, trick, or cajole him out of exercising his constitutional rights.'* "

384 U.S. at 455, 86 S.Ct. at 1617 (emphasis added) (footnote omitted).

*State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336 (1983) (footnote 3).

The *Miranda* court, as noted in the *Mitchell* dissent, observed that the three various *Miranda* defendants "in other settings ... might have exercised their constitutional rights. In the police-dominated atmosphere, they succumbed." 384 U.S. at 456, 86 S.Ct. at 1618. Calegar, however, claimed his rights, not once but twice—before Detective Wood appeared on the scene to begin his interrogation, but when again Calegar claimed his rights, the officer bulled his way ahead with the interrogation, attempting to explain it away later by giving his opinion that Calegar was "willing" to be interrogated. The officer's opinion is apparently to be accepted as tantamount to compliance with *Miranda's* directive that:

"If the interrogation continues without the presence of an attorney and a state-

ment is taken, *a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois,* 378 U.S. 478, 490, n. 14 [84 S.Ct. 1758, 1765, n. 14, 12 L.Ed.2d 977]." 384 U.S. at 375, 86 S.Ct. at 1628 (emphasis added).

and again this caveat from *Miranda:*

"After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.*" 384 U.S. at 479, 86 S.Ct. at 1630 (emphasis added).

and yet another excerpt which teaches the requirements placed on a prosecutor to establish waiver once the right to counsel and the right to remain silent have been invoked:

" 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. *Anything less is not waiver.*' " 384 U.S. at 475, 86 S.Ct. at 1628 (emphasis added).

Even a cursory reading of the examination of Detective Wood excerpted above should readily inform even the uninitiated that the police officers were engaging in the sort of "Mutt and Jeff" play mentioned in *Miranda,* thereby enabling the police to intimate to Calegar that, notwithstanding his warnings and interrogation by Officer Carroll, he nevertheless had to undergo further examination by Detective Wood, and enabling the latter to testify that *he* didn't know of Calegar's having told Officer Carroll that it would take a search warrant to open the suitcase.

All considered, one would not expect to find a more clear-cut violation of the precepts of *Miranda:*

"It is obvious that *such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation.* To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surrounding, no statement obtained from the defendant can truly be the product of his free choice." 384 U.S. at 457–58, 86 S.Ct. at 1618–19 (emphasis added).

Surely it cannot be seriously contended that Detective Wood's bull-dozing along with his interrogation of a Calegar who had both invoked his right to remain silent and his right to assistance of counsel was only after Calegar thereafter gave his "consent to be questioned." 384 U.S. at 445, 86 S.Ct. at 1612. Once it was established at the suppression hearing that Calegar had invoked those rights, there was no obligation on his counsel to proceed further until the prosecution came forth with evidence upon which a waiver of those invoked rights may be predicated. 384 U.S. at 475, 86 S.Ct. at 1628.

Behind it all, however, is the ever-permeating thought that these controversies need not often arise in Idaho if the police officers are given some schooling in that which the law of Idaho requires of them when they deal with citizens suspected of or charged with criminal activity. As Judge Towles pointed out, and which banner I carried forth in *Mitchell,* the police officers for the most part need only comply with the statute, I.C. § 19–515, which requires them to take an arrested person before the nearest available magistrate, and a failure to do so, if not excusable on some solid basis, is a strong indication that delay is for the very

purpose of police-dominated, isolated, jailhouse secret interrogation.

In conclusion, I turn to three other passages from the text of *Miranda,* which to my mind are clearly dispositive of the issue presented.

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

. . . .

"If the interrogation continues without the presence of an attorney and a statement is taken, a *heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived 'his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois,* 378 U.S. 478, 490, n. 14 [84 S.Ct. 1758, 1765, n. 14, 12 L.Ed.2d 977]. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461] (1938), and we re-assert these standards as applied to in-custody interrogation. *Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making* *available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.*

. . . .

"The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. *No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination* protects the individual from being compelled to incriminate himself in any manner; it *does not distinguish degrees of incrimination.* Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution."
384 U.S. at 473–77, 86 S.Ct. 1627–29 (emphasis added).